**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EUGENE SHAPIRO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TG THERAPEUTICS, INC., MICHAEL S. WEISS, SEAN A. POWER, and ADAM WALDMAN<br><br>Defendants. | No. 1:22-cv-06106-JSR |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


GLOSSARY OF TERMS AND ABBREVIATIONS USED IN AMENDED COMPLAINT ..... vi

I. NATURE OF THE ACTION ..... 1

A. TG Therapeutics Goes All in on Its Two Primary Drug Candidates ..... 2

B. Defendants Were Working Closely with the FDA to Obtain FDA Approval and Commercialization of UKONIQ, Ublituximab and U2 ..... 4

C. TG Therapeutics Was Required to Investigate and Report any Serious Adverse Events ..... 6

D. In 2020 TG Therapeutics Began Seeing an Alarming Increase in Serious Adverse Events Related to U2 and UKONIQ ..... 7

E. Defendants Misleadingly Touted its Drugs as Safe Despite Growing Evidence that U2 and UKONIQ Were Harming Patients ..... 8

F. The FDA Responds to the Increased Number of SAEs Resulting from Patients taking UKONIQ and U2 as Patients Continue to Die at Alarming Rates ..... 12

G. The Severe Safety Issues Posed by UKONIQ and U2 Begin to Be Revealed as the FDA Elevates its Safety Review ..... 14

H. Defendants Continue to Downplay the Risks Posed by the Increase in SAEs and Deaths from UKONIQ and U2 ..... 16

I. TG Therapeutics Unexpectedly Withdraws the U2 BLA and sNDA ..... 17

J. FDA Extended BLA PDUFA Date for its Multiple Sclerosis Drug Candidate, Ublituximab Over Safety Fears ..... 18

K. The Full Truth Emerges When the FDA Withdraws Approval of UKONIQ ..... 19

II. JURISDICTION AND VENUE ..... 19

III. PARTIES ..... 20

A. Lead Plaintiff ..... 20

B. Additional Plaintiff ..... 20

C. Defendants ..... 21

1. Corporate Defendant ..... 21

2. Individual Defendants ... 21

3. Relevant Third Parties ... 23

(a) Confidential Witnesses ... 23

(b) Plaintiffs' Expert Consultant ... 25

IV. SUBSTANTIVE ALLEGATIONS ... 26

A. TG Therapeutics' Future Depended on The Success of Its Flagship Cancer Drugs, UKONIQ and U2 ... 26

B. TG Therapeutics Conducted Clinical Trials to Demonstrate Substantial Evidence of Safety and Effectiveness ... 29

1. UNITY-CLL Clinical Trial ... 31

2. UNITY-NHL Clinical Trial ... 31

3. Other Related Trials ... 31

C. TG Therapeutics Applied for and Received FDA Designations Giving Investors the Impression that the Company was Working Closely With the FDA ... 32

1. TG Therapeutics Obtains Orphan Drug Designations for Umbralisib, Ublituximab, and U2 ... 33

2. TG Therapeutics Obtains Breakthrough Therapy Designation for Umbralisib ... 34

3. TG Therapeutics Obtains "Fast Track" Designation for U2 ... 34

4. TG Therapeutics Obtains Special Protocol Assessment Designations for U2 ... 35

D. TG Therapeutics Was Required to Report Adverse Events and Serious Adverse Events Associated with its Drug Candidates ... 36

E. TG Therapeutics Knew There Were Increased AEs and SAEs in Connection with Its Oncology Drugs, UKONIQ and U2 ... 38

F. TG Therapeutics Recorded Safety Data from Clinical Trial Sites and Discussed Results at Weekly and Monthly Calls with Executives in Attendance ... 39

G. Defendants Repeatedly Touted the Safety of TG Therapeutics' Drugs While Failing to Disclose the Serious Safety Issues Associated with UKONIQ and U2 .......... 40

H. The FDA Responds to the Increased Number of SAEs Resulting from Patients taking UKONIQ and U2 as Patients Continue to Die at Alarming Rates .......... 45

I. The Severe Safety Issues Posed by UKONIQ and U2 Begins to Be Revealed as the FDA Elevates its Safety Review .......... 47

J. Defendants Continue to Mislead the Market About UKONIQ and U2's Safety as Additional Information Is Revealed .......... 51

K. Defendants Continue to Downplay the Risks Posed by the Increase in SAEs and Deaths from UKONIQ and U2 .......... 53

L. TG Therapeutics Unexpectedly Withdraws the U2 BLA and sNDA .......... 54

M. FDA Extended BLA PDUFA Date for its Multiple Sclerosis Drug Candidate, Ublituximab .......... 56

N. The Full Truth Emerges When the FDA Withdraws Approval of UKONIQ .......... 57

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .......... 58

A. February 5, 2021 – Press Release Announcing FDA Approval of UKONIQ .......... 59

B. February 8, 2021 – TG Therapeutics FDA Approval Conference Call .......... 60

C. March 2, 2021 – 4Q2020 Earnings Press Release .......... 60

D. March 2, 2021 – 4Q2021 Earnings Conference Call .......... 61

E. May 10, 2021 – 1Q2021 Earnings Conference Call .......... 61

F. August 2, 2021 – 2Q2021 Earnings Press Release .......... 62

G. September 23, 2021 – Press Release Announcing Results from UKONIQ Safety Analysis .......... 62

VI. THE TRUTH BEGINS TO EMERGE .......... 63

A. November 30, 2021 Disclosure – Press Release Announcing TG Therapeutics to Provide Regulatory Update .......... 63

B. November 30, 2021 – TG Therapeutics Special Call .......... 64

C. December 14, 2021 – Press Release Announcing UNITY-CLL Phase 3 Clinical Results ........ 65

D. January 10, 2022 – J.P. Morgan 40th Annual Healthcare Conference ........ 66

E. March 1, 2022 – 4Q2021 Earnings Conference Call ........ 67

F. April 15, 2022 Disclosure – Press Release Announcing Voluntary Withdrawal of BLA/sNDA for U2 ........ 70

G. April 18, 2022 Disclosure – TG Therapeutics Special Call ........ 70

H. May 31, 2022 Disclosure – Press Release Announcing FDA Extension of Ublituximab PDUFA Date ........ 71

I. June 1, 2022 Disclosure – FDA Published Drug Safety Communication Withdrawing Approval of UKONIQ ........ 72

VI. LOSS CAUSATION/ECONOMIC LOSS ........ 72

A. November 30, 2021 – First Partial Corrective Disclosure/Materialization of the Risk ........ 75

B. April 15-18, 2022 – Second Partial Corrective Disclosure/Materialization of the Risk ........ 77

C. May 31, 2022 – Third Partial Corrective Disclosure/Materialization of the Risk ........ 79

D. June 1, 2022 – Final Corrective Disclosure/Materialization of the Risk ........ 80

VII. ADDITIONAL INDICIA OF SCIENTER ........ 81

A. Ublituximab, Umbralisimab, and U2's Importance to the Company Supports a Strong Inference of Scienter Under the Core Operations Doctrine ........ 82

B. TG Therapeutics was Motivated to Conceal the Overall Survival Rate ........ 83

C. Defendants Received Special Designations Allowing the Company to Work Closely with the FDA ........ 84

D. Defendants' Statements Support a Strong Inference of Scienter ........ 85

VIII. CLASS ACTION ALLEGATIONS ........ 86

IX. PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ........ 88

X. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........ 90

XI. CONTROL PERSON ALLEGATIONS ..... 90

XII. CAUSES OF ACTION ..... 92

COUNT I For Violation of §10(b) of the Exchange Act and Rule 10b-5 against Defendants TG Therapeutics, Weiss, Power, and Waldman ..... 92

COUNT II For Violation of §20(a) of the Exchange Act against the Individual Defendants ..... 94

XIII. PRAYER FOR RELIEF ..... 95

XIV. JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS ..... 95

**GLOSSARY OF TERMS AND ABBREVIATIONS**
**USED IN AMENDED COMPLAINT**

| Term | Definition |
|---|---|
| AEs | Adverse Events |
| BLA | Biologics License Application |
| Boston | Lead Plaintiff Boston Retirement System |
| CBER | Center for Biologics Evaluation and Research |
| CLL | Chronic Lymphocytic Leukemia |
| CMC | Chemistry, Manufacturing and Controls |
| CW | Confidential Witness |
| Class Period | February 5, 2021 through May 31, 2022, both dates inclusive |
| Complaint | Amended Class Action Complaint |
| Defendants | Defendants TG Therapeutics Inc., Michael S. Weiss, Sean A. Power, and Adam Waldman |
| Exchange Act | Securities Exchange Act of 1934 |
| FAERS | FDA Adverse Event Reporting System |
| FDA | U.S. Food and Drug Administration |
| FL | Follicular Lymphoma |
| GMP | Good Manufacturing Practices |
| HR | Hazard Ratios |
| INDs | Investigational Drug Applications |
| Individual Defendants | Defendants Michael S. Weiss, Sean A. Power, and Adam Waldman |
| MS | Multiple Sclerosis |
| MZL | Marginal Zone Lymphoma |
| NASDAQ | NASDAQ Stock Market |
| NDA | New Drug Application |
| NHL | Non-Hodgkin's Lymphoma |
| ODAC | Oncologic Drugs Advisory Committee |
| OS | Overall Survival |
| PDUFA | Prescription Drug User Fee Act |
| Power | Defendant Sean A. Power |

| Term | Definition |
|---|---|
| RMS | Relapsing Multiple Sclerosis |
| SAEs | Serious Adverse Events |
| SEC | U.S. Securities and Exchange Commission |
| sNDA | Supplemental New Drug Application |
| SPA | Special Protocol Assessment |
| Sensebaugh | Plaintiffs' Expert Consultant Suzanne M. Sensebaugh |
| Sportelli | Peter Sportelli, TG Therapeutics' Chief Operating Officer |
| TG | Defendant TG Therapeutics Inc. |
| TGTX | Defendant TG Therapeutics Inc. NASDAQ ticker symbol |
| TMF | Trial Master File |
| U2 | Ublituximab and UKONIQ (Umbralisib) |
| UKONIQ | Commercial name of Umbralisib |
| Waldman | Defendant Adam Waldman |
| Weiss | Defendant Michael S. Weiss |
| Western PA Building Trades | Additional Plaintiff Building Trades Pension Fund of Western Pennsylvania |

Lead Plaintiff Boston Retirement System ("Boston") and Additional Plaintiff Building Trades Pension Fund of Western Pennsylvania ("Western PA Building Trades") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by its undersigned counsel, hereby bring this Amended Class Action Complaint (the "Complaint") against Defendants TG Therapeutics, Inc., ("TG Therapeutics" or "TG" or the "Company"), Michael S. Weiss ("Weiss"), Sean A. Power ("Power"), and Adam Waldman ("Waldman") (the "Individual Defendants," and collectively with TG Therapeutics, "Defendants"). The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and upon information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by TG Therapeutics; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; consultation with an expert in the field; documents obtained from a Freedom of Information Act ("FOIA") request; and interviews of former employees of TG Therapeutics with knowledge of the matters alleged herein. Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

## I. NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of TG Therapeutics during the period from February 5, 2021 through May 31, 2022, both dates inclusive, (the "Class Period"),

and were damaged thereby (the "Class").[1] The action is brought against TG Therapeutics and certain of its officers for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

**A. TG Therapeutics Goes All in on Its Two Primary Drug Candidates**

2. TG Therapeutics is a biopharmaceutical company that focuses on the acquisition, development, and commercialization of treatments for B-cell malignancies and autoimmune diseases such as cancer and multiple sclerosis ("MS"). During the Class Period, the Company's most advanced drug candidates were: (1) Umbralisib (or as it is known commercially, "UKONIQ"); and (2) Ublituximab.

3. UKONIQ, is an oral, once-daily dual inhibitor of PI3K-delta and CK1-epsilon that purportedly treats two specific types of non-Hodgkin's Lymphoma ("NHL"): Follicular Lymphoma ("FL"), and Marginal Zone Lymphoma ("MZL"). Ublituximab, is an antibody that purportedly treats Relapsing Multiple Sclerosis ("RMS"). However, the most important and commercially explosive treatment in TG Therapeutics' pipeline was a combination of Ublituximab and UKONIQ, which the Company referred to as "U2" and was being developed to treat certain types of leukemia namely Chronic Lymphocytic Leukemia ("CLL"), FL, and MZL. However, U2 purportedly had the potential to treat numerous additional B-cell disorders.

4. Investors and analysts understood the blockbuster potential of U2. For example, an August 7, 2018 SunTrust analyst report touted the importance of the then-ongoing U2 clinical

---

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of TG Therapeutics during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) TG Therapeutics' employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

trial called UNITY-CLL: "**[g]iven the blockbuster market potential for U2** in **CLL, and potential read-through to other indications (iNHL, MS)**, we think positive UNITY-CLL data could lead to substantial (100%+) appreciation in TGTX's share price." Likewise, according to a Jefferies analyst report, published on December 17, 2019: "**A successful UNITY-CLL paves the path for U2 to gain dominance in the CLL market as a backbone of future combos. A successful UNITY-CLL would be transformative to TG . . .**"

5. Prior to the start of the Class Period, TG Therapeutics had not received approval for the sale of any of the Company's developmental drug candidates in any market and, therefore, had not generated any product sales or meaningful product revenue from its drug candidates. And while the Company had a few other drug candidates in development, those drugs were still undergoing early Phase 1 trials and were therefore years away from commercialization and generating revenue for the Company. Accordingly, U.S. Food and Drug Administration ("FDA") approval and the successful commercialization of UKONIQ, Ublituximab and, in particular, U2, were crucial to the Company's future success and thus, to investors as well.

6. However, UKONIQ, and by extension U2, were being highly scrutinized by the FDA, the pharmaceutical industry, and investors alike. While promising, the pharmaceutical technology behind UKONIQ—known as a PI3K inhibitor—was understood to be a dangerous treatment option, because inhibiting the PI3K receptor leads to significantly increased risk of serious infection and associated toxicity, which can elicit dangerous side effects. Accordingly, investors were particularly focused on the safety profile of U2 and UKONIQ. For instance, a Cantor Fitzgerald analyst report published on November 6, 2019, entitled, "ASH updates incremental positive, but remain positive into UNITY-CLL update" stated, "Investment Thesis: We think both umbralisib and ublituximab are clinically de-risked, but investors remain cautious

on market potential. **Although the PI3K commercial landscape in particular has been historically challenging due to class safety issues, we think umbralisib's safety profile is differentiated**. We think TG has a potentially best-in-class PI3K and other pipeline assets that make attractive oncology and autoimmune combinations. We think safe, late-stage assets with proven activity will allow for many future novel combinations that would be upside to our current valuation. We think investors will give more credit to the stock as the Ph3 data accrues across multiple indications."

### B. Defendants Were Working Closely with the FDA to Obtain FDA Approval and Commercialization of UKONIQ, Ublituximab and U2

7. The FDA required TG Therapeutics to submit a New Drug Application ("NDA") or a Biologics License Application ("BLA") before the Company's drugs could become commercially available.[2] The data required to submit those applications come from costly and time-consuming clinical trials that test the safety and efficacy of a drug candidate. Phase 1 clinical trials typically evaluate an investigational drug's safety and dosage tolerance. Phase 2 clinical trials usually involve larger patient populations and: evaluate dosage tolerance and appropriate dosage; identify possible short-term adverse effects and safety risks; and provide a preliminary evaluation of the efficacy of the drug for specific indications. Phase 2 clinical trials are sometimes done in multiple sub-phases denoted as Phase 2a and Phase 2b. Phase 2a trials are typically smaller and provide additional introductory information on drug safety and efficacy whereas Phase 2b clinical trials are usually larger and may be for longer durations of time. Finally, Phase 3 clinical trials test for efficacy and safety in an even further expanded patient population.

[2] Drug sponsors also sometimes submit a supplemental new drug application ("sNDA") to provide the FDA with additional information and data.

8. Prior to and during the Class Period, TG Therapeutics was undergoing several clinical trials for its primary drug candidates. Specifically, the UNITY-NHL trial was an ongoing Phase 2b trial for both the U2 combination and UKONIQ alone for the treatment of FL and MZL. The ULTIMATE I and II trials were ongoing Phase 3 trials for Ublituximab for treatment of MS. And most importantly, the UNITY CLL trial was a Phase 3 trial for U2 for the treatment of CLL.

| Clinical Drug Candidate | Target Disease | Stage of Development (trial name) |
|---|---|---|
| Umbrasilib (UKONIQ) | Marginal Zone Lymphoma (MZL) | Phase 2b trial (UNITY-NHL) |
| | Follicular Lymphoma (FL) | Phase 2b trial (UNITY-NHL) |
| Ublituximab | Relapsing Multiple Sclerosis (MS) | Phase 3 trials (ULTIMATE I and II) |
| U2 (Umbralisib + Ublituximab) | Chronic Lymphocytic Leukemia (CLL) | Phase 3 trial (UNITY-CLL) |
| | Marginal Zone Lymphoma (MZL) | Phase 2b trial (UNITY-NHL) |
| | Follicular Lymphoma (FL) | Phase 2b trial (UNITY-NHL) |
| Cosibelimab | B-cell cancers | Phase 1 trial |
| TG-1701 | B-cell cancers | Phase 1 trial |
| TG-1801 | B-cell cancers | Phase 1 trial |

9. Critically, prior to and throughout the Class Period, Defendants were able to apply and obtain a number of advantageous designations offered by the FDA including Orphan Drug

status, breakthrough therapy status, Fast Track status, and Special Protocol Assessment ("SPA") for each of its clinical trials and resulting NDA and BLA applications to the FDA. Such designations were critical to the Company and investors alike because it expedited the process for approval and provided TG Therapeutics with special access to FDA officials that could consult with the Company on the design and rollout of its clinical trials as well as data submissions in connection with its NDA and BLA. These designations gave companies, like TG Therapeutics, the ability to work closely with the FDA on its trials and submissions (and get the FDA's buy in as a result), which greatly improved the chances of the drugs approval--that is so long as the Company was being transparent with the FDA about the clinical trials and resulting data.

10. Analysts acknowledged the importance of these designations for the rapid success of TG Therapeutics' drug candidates and ultimately their portfolios. For example, Jefferies reported on December 17, 2019, that "**UNITY-CLL has been conducted under a SPA w/ the FDA, ensuring regulatory buy-in in place**." Likewise, an April 21, 2021 H.C. Wainwright & Co. analyst report stated that, "**we believe the Fast Track Designation puts [U2] on the right path for a potential launch late this year**."

### C. TG Therapeutics Was Required to Investigate and Report any Serious Adverse Events

11. The FDA ensures that drug candidates being tested in clinical trials are safe by requiring drug sponsors, like TG Therapeutics, to report any adverse events ("AEs") or serious adverse events ("SAEs") that are unexpected and suspected (reasonable possibility that the drug caused the event) within a certain time period. Drug sponsors running clinical trials and applying for approval to the FDA are required to report adverse events, especially deaths, directly to the FDA. The FDA requires adverse event reporting within 15 days of serious and life-threatening events. Deaths must be reported on an expedited basis (i.e., within 7 days).

12. Once a drug sponsor reports an adverse event or serious adverse event, it is incumbent upon the drug sponsor to then investigate the event and determine whether or not the event was attributable to the drug candidate or some other cause. Accordingly, the burden rested squarely on TG Therapeutics to both report all AEs and SAEs during its clinical trials and investigate whether or not those deaths were attributable to TG Therapeutics' drugs. Moreover, as part of its NDA and BLA to the FDA (and/or if asked directly by the agency,) TG Therapeutics was also required to collect and retain safety data and analyses related to the cause of reported AEs and SAEs so the FDA could assess various safety statistics including Overall Survival ("OS") statistics and Hazard Ratios ("HR").[3]

### D. In 2020 TG Therapeutics Began Seeing an Alarming Increase in Serious Adverse Events Related to U2 and UKONIQ

13. Prior to and during the Class Period, there were no less than 150 AEs reported to the FDA related to the use of UKONIQ and U2. Of those 150, an **astonishing 44% (66) of the AEs reported between February 26, 2019 and December 2021 were SAEs (*i.e.,* serious, unexpected adverse events including death, hospitalization, and life-threatening illness)**. As described below, of the SAEs**, the report lists 19 that resulted in death and no less than 50 that resulted in hospitalizations**.

14. Notably, according to former TG employees, the Company was closely tracking the adverse events in meetings and in a database. Specifically, Confidential Witness ("CW") 2

[3] Hazard Ratios measure whether a patient taking a drug in a clinical study is more likely to die than a patient in the control arm taking a placebo. A HR *below* 1.00 demonstrates that a patient taking the drug being tested is less likely to die whereas a HR *above* 1.00 demonstrates that the patient taking the drug is more likely to die. Because an HR of above 1.00 effectively signals to the FDA that the drug is more likely to kill the patient than if they had not taken the drug, such a finding raises red flags and would likely provide strong evidence to the FDA that a drug's potential benefits do not outweigh the costs.

explained that these calls were organized by the "Study Lead" and on these calls all data was discussed, and the doctors from each site would provide details related to any adverse events or deaths that had occurred. CW2 recalled extremely detailed minutes taken on those calls. According to CW2, the minutes from the Site Calls were also preserved by TG Therapeutics' regulatory department.

15. A vast majority of the serious adverse events began occurring in the middle of 2020. Indeed, after only reporting a few adverse events in 2019, beginning in August 2020, Defendants started to see a meaningful uptick in the number of serious adverse events that patients were experiencing from taking U2 and UKONIQ. Specifically, between August 2020 and February 5, 2021—the first day of the Class Period—**the Company reported four new SAEs** that resulted in hospitalization or "other serious important medical event" in the prior six months—a sharp rise in frequency when compared to the preceding two-year period.

16. As the Class Period progressed and the number of SAEs and deaths from U2 and UKONIQ continued to mount, the FDA would ultimately get involved, but not before Defendants misled the market about the safety of its drugs and the risks the Company faced in obtaining FDA approval for U2.

### E. Defendants Misleadingly Touted its Drugs as Safe Despite Growing Evidence that U2 and UKONIQ Were Harming Patients

17. The Class Period begins on February 5, 2021. On that date, TG Therapeutics issued a press release announcing the FDA's accelerated approval of UKONIQ for treating MZL and FL and signaling the commercial launch of the drug in the United States. In the press release, Defendant Weiss touted the approval of the drug and explained to investors the Company's plan to begin selling the drug to patients: "***Today's approval of UKONIQ marks a historic day for our Company with this being our first approval and we are extremely pleased to be able to bring our***

***novel inhibitor of PI3K-delta and CK1-epsilon to patients with relapsed/refractory MZL and FL.*** We have built a commercial team with significant experience who will immediately start to engage our customers to educate them on UKONIQ and how to access the product for patients in need and expect to make UKONIQ available to US distributors in the next few days."

18. However, Defendants' statements touting the approval and commercialization of the drug were false and misleading because they failed to disclose the increase in serious adverse events the Company was seeing and reporting to the FDA related to UKONIQ at that time. Specifically, by February 5, 2021, the Company had already begun seeing an uptick in the frequency of SAEs from patients taking UKONIQ, that resulted in hospitalization or a serious important medical event.

19. Such an uptick in frequency was also alarming given the history of PI3K inhibitors and the dangers they posed to oncology patients. Indeed, Defendants held a conference call with investors that same day, further touting the FDA approval and playing up UKONIQ's supposedly superior safety profile as compared to other PI3K inhibitor drugs. Specifically, Defendant Waldman stated: "And I think in previous launches around PI3K, that might not have been really well done***. I think we do have a differentiated product. I think that, that may be another point of differentiation here from the previous launches. We think our safety profile is very different***."

20. Analysts relied on Defendants' false and misleading statements touting UKONIQ's supposedly advantageous safety profile. For example, an H.C. Wainwright & Co. analyst report published on February 8, 2021 titled, "Umbralisib, Now Ukoniq, Approved in MZL and FL Patients; Raising PT by $1," stated, "**Approval based on impressive data… We believe the safety profile of Ukoniq is differentiated from other PI3K inhibitors**." Likewise, a Jefferies analyst report published the same day titled, "Early Approvals in MZL/FL Suggest Value-Creation

Throughout '21; Reiterate Buy," stated, "**Ukoniq is approved for FL/MZL, with a clean and differentiated label, supporting a strong launch**. . . **Unlike other oral PI3Kis (e.g., idelalisib, duvelisib), Ukoniq does not carry blackbox warnings such as infections, diarrhea/colitis, pneumonitis, liver tox, etc**."

21. During the month of February 2021, **two more SAEs were reported by the Company to the FDA**. Both resulted in hospitalization of the patient and one of them was life-threatening. Yet, during the Company's 4Q 2020 earnings press release on March 2, 2021, Defendant Weiss continued to tout positive results from the UNITY-NHL trials and the positive impact the drugs' commercialization would have on what seemed to investors to be the inevitable approval of U2 for CLL stating: "2020 was a year of data and regulatory execution for us as ***we delivered results from our UNITY-NHL study that led to the approval of UKONIQ in relapsed/refractory MZL and FL and from UNITY-CLL that will be used to support the current rolling BLA submission for ublituximab in combination with umbralisib for patients with CLL.***"

22. Investors reacted to the positive results and saw UKONIQ as a highly promising PI3K inhibitor compared to competitor drugs. For instance, a Cantor Fitzgerald analyst report published on March 3, 2021 stated, "**Most important, in our view, is that the physician feedback seems positive so far, and there is a perception of differentiation from the PI3K class**. As we have often discussed, the PI3K delta class has some negative baggage associated with it on toxicity. However, UKONIQ did not see high levels of the typical GI- and liver-related toxicity."

23. By May 15, 2021, **TG Therapeutics reported three more SAEs to the FDA** related to the use of UKONIQ, all of which resulted in hospitalization and **one that resulted in the death of the patient**. Nonetheless, Defendants continued to tout the safety and efficacy rates resulting from the clinical trials. For instance, during TG Therapeutics' 1Q 2021 earnings

conference call, Defendant Waldman told investors that, "***Through market research, advisory boards, and our field team engagements, we have confirmed that UKONIQ is a different -- is seen as a differentiated product. We've consistently heard that the proven efficacy across marginal zone and follicular, its unique MOA, tolerable safety profile, low rates of discontinuation, and a lack of a black-box warning are important differentiators with health care providers and payers. We believe that these factors help establish UKONIQ in a class of its own***."

24. In the Summer of 2021, the number of SAEs continued to climb with even greater frequency. **In June 2021, the Company reported five more SAEs, including two deaths** and two events that resulted in a disability related to the use of UKONIQ. **In July 2021, TG Therapeutics reported seven additional SAEs, including the death of three more patients.** And, in August 2021, the Company reported **ten additional SAEs with four additional patient deaths** as well as numerous events that resulted in life threatening circumstances, hospitalizations, and disability.

25. Despite the undeniable uptick in serious adverse events and patient deaths, the Company continued to make positive statements about the safety and efficacy of UKONIQ and its related oncological applications despite knowing the severe safety concerns the drug posed to patients. For example, on August 2, 2021, TG Therapeutics issued a press release stating: "***We are pleased with the progress made throughout the second quarter, including our ongoing launch of UKONIQ in relapsed or refractory MZL and FL, FDA's acceptance of our BLA/sNDA for the combination of ublituximab and UKONIQ (U2) to treat CLL and SLL, and the continued advancement of our clinical programs. We have built a strong commercialization infrastructure to launch UKONIQ and have received positive feedback from healthcare***

***providers on their experiences with the product and with the TG team***. When, in reality, Defendants knew that while there may have "positive feedback from healthcare providers" they failed to disclose there were no less than twenty-two SAEs and nine patient deaths in the months of June, July, and August alone, which Defendants conspicuously omitted.

26. The market specifically honed in on TG Therapeutics' statements regarding the safety of UKONIQ compared to other PI3K inhibitors. For example, an Evercore ISI analyst report and presentation published on August 2, 2021 described TG Therapeutics' 2Q 2021 earnings and outlook. Specifically, "UKONIQ's Safety is a Key Differentiator…: **UKONIQ has a cleaner safety profile vs. approved PI3K inhibitors and INCY's parsaclisib (keep an eye on MEIP's zandelisib). So far, PI3Ks have had minor impact on treatment landscape due to worrying toxicities (neutropenia, colitis) and high discontinuation rates that increase over time but newer products such as Ukoniq seem to have addressed that**."

### F. The FDA Responds to the Increased Number of SAEs Resulting from Patients taking UKONIQ and U2 as Patients Continue to Die at Alarming Rates

27. Unbeknownst to investors, in September 2021, the FDA issued a request to the Company to conduct an analysis of overall survival ("OS") in connection with the UNITY-CLL trial, which was still ongoing at that time. However, the Company's ability to demonstrate the safety of UKONIQ to the FDA would only get more difficult over the course of the month because **TG Therapeutics would report an additional seven SAEs, including another patient death.**

28. Internally, Defendants acknowledged the significance of the SAEs. Specifically, a former TG Therapeutics employee, CW4, recalled that in approximately September 2021, there was a mandatory company-wide Zoom call where current CEO Mike Weiss addressed a "pocket of SAEs (Serious Adverse Events)" related to UKONIQ and again employees were provided the same rationale that the deaths were due to COVID rather than TG Therapeutics' drug. Moreover,

CW4 continued to say that employees were told that TG Therapeutics would need to put their clinical trials on hold until they were able to provide evidence that the deaths were not due to UKONIQ, but instead due to COVID or other unrelated factors. Likewise, the FDA inquiry was understood as crucial within the Company. For example, CW3 recalled TG Therapeutics gearing up for a big and important FDA audit that was to take place around early November 2021. CW3 also recalled that the time of the audit was very hectic at the Company.

29. Yet, on September 23, 2021, the Company issued a press release continuing to tout the safety of UKONIQ, while omitting the months' worth of evidence that UKONIQ was not safe but in fact killing and hospitalizing patients at an alarming rate. Specifically, on September 23, 2021, the Company issued a press release entitled "TG Therapeutics Announces Publication of Results from an Integrated Safety Analysis of UKONIQ (umbralisib) in Blood Advances." Therein, Defendants touted UKONIQ's safety profile based on purportedly "comprehensive toxicity data" from the Company's past clinical trials. The release quoted Defendant Weiss as stating:

> We are pleased that the integrated safety analysis of 371 patients treated with UKONIQ has been published in Blood Advances. ***We believe these data further support the differentiated safety profile of UKONIQ, the first and only PI3k-delta and CK1-epsilon inhibitor, which is now commercially available to patients with relapsed or refractory marginal zone lymphoma and follicular lymphoma***. As we strive toward obtaining FDA approval of the investigational combination of UKONIQ and ublituximab, U2, in CLL by the PDUFA goal date of March 25, 2022, furthering our understanding of the safety and tolerability profile of UKONIQ remains paramount to us.

30. However, Defendant Weiss' statements touting the safety of UKONIQ based on prior clinical trial data were false and misleading in light of the massive increase in deaths and SAEs the Company had been reporting to the FDA over the past year. Moreover, Defendants' statements left investors with the impression that the supposedly good safety profile of the drug

would contribute to the approval of U2 for CLL when in reality the FDA had already requested further information regarding overall survival in the UNITY-CLL trial, calling the drug's approval into significant doubt. Notably, as the Company would later disclose, far from being safe, based on the data available to Defendants (but not investors), the HR for UKONIQ was approximately **1.23**—significantly over the 1.00 threshold meaning patients taking UKONIQ more likely to die than patients in the control arm.

31. While investors remained excited about the commercialization of UKONIQ and approval of U2 for CLL based on Defendants' statements, in reality, the likelihood of approval and continued sale of UKONIQ was foundering. While the Company was scrambling to pull together a response to the FDA's overall survival analysis, the number of deaths and SAEs only continued to rise rendering any chance of demonstrating positive overall survival statistics or a HR below 1.00 near impossible. Indeed, **in October the Company reported <u>nine</u> more SAEs, including five additional deaths, four of which occurred over the course of one week.** And, **in November, TG reported to the FDA that UKONIQ caused <u>thirteen</u> more SAEs including two deaths**.

### G. The Severe Safety Issues Posed by UKONIQ and U2 Begin to Be Revealed as the FDA Elevates its Safety Review

32. The truth about UKONIQ's massive safety issues started to be revealed on November 30, 2021, when the Company issued a "Regulatory Update" press release announcing that the FDA notified the Company that it planned to host a meeting of the Oncologic Drugs Advisory Committee ("ODAC") in connection with its review of the U2 BLA and sNDA for the treatment of CLL. The press release went on to reveal that the "**FDA's concern giving rise to the ODAC meeting appears to stem from an early analysis of overall survival from the UNITY-CLL trial**" (*i.e.*, the analysis the Company just performed in response to the FDA's September

inquiry). The release went on to reveal that the FDA had requested the overall survival analysis in September, and that the results demonstrated "[a]s of September 2021, the cut-off date for the overall survival analysis . . . there was an imbalance in favor of the control arm" that resulted in a hazard ratio of 1.23, or 1.04 when excluding deaths related to COVID-19.

33. Analysts were surprised by the announcement given the Company's positive statements about UKONIQ and U2's safety in the past. For example, on November 30, 2021 Jeffries published an analyst report entitled "Surprising ODAC Meeting Creates Uncertainty for CLL Approval" which explained "[t]he stock was down ~40%+ intraday as investors primarily concern 1) likelihood of getting CRL for U2 in CLL; 2) impact to FL/MZL current label and launch; 3) impact to upcoming ublituximab BLA in MS." The report also showed surprise given investors' understanding that Ukoniq had not resulted in unexpected AEs: "we will watch for more mature/detailed safety/OS data to make approvability assessment for CLL; 2) FL/MZL OS has not been reported and Ukoniq has not shown unexpected AEs, so the inclusion to ODAC discussion along with CLL is mostly for precaution." Likewise, JP Morgan issued an analyst report that same day stating: "the announcement of an ODAC panel for U2 in CLL (anticipated March/April timeframe), and the resulting likely push of the 3/22/21 PDUFA, arrives as a negative surprise."

34. In response to this news **shares of TG Therapeutics plummeted $8.16 per share, or 34.93%, to close at $15.20 per share on November 30, 2021**.

35. Notwithstanding these disclosures, Defendants continued to mislead investors about UKONIQ's safety and path to approval. Specifically, despite knowing that UKONIQ was causing an alarming rate of SAEs and deaths (that continued to occur after the Company performed the FDA survival analysis), a November 30, 2021 press release quoted Defendant Weiss'

reassurances to investors stating "We appreciate the FDA's efforts in reviewing the U2 BLA/sNDA and its interest in obtaining the perspective of the ODAC regarding the benefit-risk of UKONIQ and the U2 combination. ***We believe UKONIQ is a unique PI3K inhibitor, with a differentiated toxicity and tolerability profile and believe the data submitted thus far are supportive of approval of U2 in CLL.***"

36. However, Defendants' reassuring statements above were false and misleading. Not only were Defendants aware of a significant increase in SAEs and deaths attributable to UKONIQ, but those AEs had continued through to October and November, even after finishing the overall survival analysis for the FDA in September– effectively confirming that no amount of digging into the data would improve the hazard ratio, which was only getting worse as more people died from using UKNOIQ and U2. Indeed, Defendants gave investors the impression that the analysis performed after the September 2021 cutoff would benefit the OS analysis. For example, a Jeffries analyst report published on November 30, 2021 stated, "The current OS analysis was early (cut off as of Sept '21, ~20% expected events), and final OS data could change materially (Co plans to look at OS every 3-6M for updates)."

### H. Defendants Continue to Downplay the Risks Posed by the Increase in SAEs and Deaths from UKONIQ and U2

37. On March 1, 2022, TG Therapeutics hosted an earnings conference call with investors and analysts to discuss the Company's Q4 2021 results. During the conference call with analysts, Defendants continued to reassure investors about the safety of the drug and downplayed any concerns about FDA approval of U2. For example, during the call, Defendant Weiss misleadingly told investors that they were able to continue their analysis and lower the HR closer to 1.00:

> We spent the next two months trying to close the information gap. ***We were pleased to report about a month ago that we're able to reduce the missing survival***

> ***information from 15% down to 5%. And we were further pleased to report at a high level that the capture of the additional survival data, the overall survival analysis both in the ITT and the COVID-censored populations, the overall survival hazard ratio has improved from what we had seen in the original submission to the FDA. We provided that update to the FDA late last month.***

38. However, again, Defendants' statements were false and misleading because they significantly downplayed the impact that the increasing SAEs and deaths would have on the FDA's assessment of the safety of UKONIQ, especially given the continued reporting of SAEs even after the FDA asked for an overall survival analysis as of September 2021.

39. On March 10, 2022, TG Therapeutics announced that the FDA set a date of April 22, 2022 for the previously declared meeting of the ODAC in connection with its review of the BLA/sNDA for U2, and reiterated the Company's excitement to present its case at the meeting.

### I. TG Therapeutics Unexpectedly Withdraws the U2 BLA and sNDA

40. However, on April 15, 2022, just seven days prior to the April 22, 2022 ODAC meeting, Defendants abruptly announced that they would be withdrawing the U2 BLA and sNDA. According to the press release, the decision to withdraw the BLA and sNDA **was based on recently updated overall survival (OS) data from the UNITY-CLL Phase 3 trial that showed an increasing imbalance in OS**.

41. Notably, the disclosure explained that the withdrawal was based on a new, more recent information request by the FDA for data beyond that which was submitted to the FDA in February 2022 with the September 2021 cut-off date. Specifically, the release stated that **"[p]ursuant to a recent information request made by the FDA, updated OS data were collected that showed an increasing imbalance in favor of the control arm, differing from the improved results provided to the FDA in February 2022**."

42. Defendants, effectively, had no choice but to disclose that the Company was withdrawing the U2 BLA and sNDA and pulling sale of UKNOIQ because the FDA would have

informed the Company of the data and topics that were going to be discussed at the upcoming ODAC meeting, and then, sent similar information to the public shortly before the meeting. Therefore, Defendants would have received the data that the FDA deemed alarming and subsequently, known that such information would soon be disclosed to the public if they did not affirmatively withdraw the application.

43. Analysts were stunned to hear of the voluntary withdrawal after years of touting progress, purported trial success, and high probability of approval. Specifically, an April 15, 2022 Evercore ISI analyst report titled, "The Hits Just Keep on Coming…Achtung Baby," stated, "We've had a number of investors asking where TGTX would trade without its U/U heme franchise - and it looks like we'll find out soon enough. The company unexpectedly withdrew its BLA/sNDA for the combination of Ukoniq (PI3K inhibitor) and ublituximab (CD20 antibody) for CLL and cancelled the Advisory Committee meeting."

44. On April 18, 2022, TG Therapeutics continued to disclose surprising information related to the fallout of the serious health problems posed by UKONIQ. Specifically, the Company announced **that it would be winding down its oncology program and halting all of the early-stage programs related to B-cell malignancies**—*i.e.*, all of the oncology drugs in TG Therapeutics' pipeline.

45. In response to this news **TG Therapeutics' stock price fell $1.93 per share, or 21.81%, to close at $6.92 per share on April 18, 2022**.

### J. FDA Extended BLA PDUFA Date for its Multiple Sclerosis Drug Candidate, Ublituximab Over Safety Fears

46. The fallout from Defendants' misleading behavior about the safety of U2 and UKONIQ continued on May 31, 2022. On that date, after months of Defendants reassuring investors that the FDA's concerns with UKONIQ would have no effect on its MS drug

Ublituximab, the Company announced that the FDA would be putting off the critical Prescription Drug User Fee Act ("PDUFA") goal date for the approval of the drug explaining that the FDA extended the PDUFA goal date to "allow time to review a submission provided by the Company in response to an FDA information request, which the FDA deemed a major amendment."

47. On this news, **TG Therapeutics' stock price fell $0.75 per share, or 14.51%, to close at $4.42 per share on May 31, 2022.**

### K. The Full Truth Emerges When the FDA Withdraws Approval of UKONIQ

48. Finally, on June 1, 2022, the FDA published a drug safety communication announcing that it was rescinding the approval of UKONIQ for treatment of FL and MZL, effectively ending any chance of resuscitating UKONIQ or U2's chances for commercial applications.

49. On this news, **TG Therapeutics' stock price fell $0.51 per share, or 11.54%, to close at $3.91 per share on June 1, 2022, further injuring investors.**

## II. JURISDICTION AND VENUE

50. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa, and under 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

51. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b), as upon information and belief, TG Therapeutics shareholders reside in this District, the acts and transactions giving rise to the violations of law complained of occurred in part in this District, the false and misleading statements were disseminated in this District, and the manipulative conduct was carried out in part in this District.

52. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

53. Lead Plaintiff, Boston, purchased TG Therapeutics securities during the Class Period at artificially inflated prices, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. Plaintiff Boston is a defined-benefit governmental pension plan headquartered in Boston, Massachusetts. Boston manages assets on behalf of beneficiaries associated with the City of Boston, including the Boston Redevelopment Authority, the Boston Housing Authority, the Boston Water and Sewer Commission, and the Boston Public Health Commission. As of September 26, 2022, Boston managed approximately $6.4 billion in net assets on behalf of more than 34,000 members and their beneficiaries. Boston purchased TG Therapeutics common stock during the Class Period, as set forth in the certification previously filed with the Court (*see* ECF No. 10-1) and suffered damages as a result of the federal securities law violations alleged herein. By order dated October 10, 2022 (*see* ECF No. 41), this Court appointed Boston as Lead Plaintiff in this action.

### B. Additional Plaintiff

54. As set forth in the Certification attached hereto as Exhibit 1, Additional Plaintiff Western PA Building Trades purchased TG Therapeutics securities during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. Founded in 1955,

Western PA Building Trades is a defined-benefit governmental pension plan headquartered in Pittsburgh, Pennsylvania.

### C. Defendants

#### 1. Corporate Defendant

55. Defendant TG Therapeutics is incorporated under the laws of the Delaware with its principal executive office located at 2 Gansevoort Street, 9th Floor, New York, New York 10014. TG Therapeutics' common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "TGTX." TG Therapeutics' Annual Report filed on Form 10-K with the SEC on March 1, 2022, states that 142,817,329 shares of TG Therapeutics were outstanding as of February 23, 2022.

#### 2. Individual Defendants

56. Defendant Michael S. Weiss ("Weiss") has served as TG Therapeutics' Chairman, Chief Executive Officer, and President at all relevant times. Defendant Weiss began his professional career as a lawyer with Cravath, Swaine & Moore LLP in 1991. In 1999 Weiss founded and was the CEO of ACCESS Oncology which merged with Keryx Biopharmaceuticals ("Keryx") in 2004 where Weiss served as Chairman and CEO until 2009 at which point Weiss became a private equity and hedge fund manager with a focus on biotech and pharmaceutical acquisitions. Specifically, from 2009 to 2019--prior to and during the time he was CEO of TG Therapeutics--Defendant Weiss also served as Co-Portfolio Manager and Managing Partner of a private equity Fund known as Opus Point Partners, LLC—an "investment advisory firm" that specializes in healthcare and life sciences. During the Class Period, Defendant Weiss made false and misleading statements, signed relevant SEC documents, and spoke during conference calls with investors earnings and was quoted in press releases extensively about TG Therapeutics' drugs as well as clinical trial results.

57. Defendant Sean A. Power ("Power") has served as TG Therapeutics' Chief Financial Officer, Corporate Secretary, and Treasurer at all relevant times. During the Class Period, Power made false and misleading statements and participated in conference calls with investors, as well as signed TG Therapeutics' financial filings and other relevant filings with the SEC.

58. Defendant Adam Waldman ("Waldman") has served as TG Therapeutics' Chief Commercial Officer at all relevant times. During the Class Period, Waldman participated in conference calls with investors and made false and misleading statements.

59. Defendants Weiss, Power, and Waldman (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors (*i.e.*, the market). The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

### 3. Relevant Third Parties[4]

#### (a) Confidential Witnesses

60. **CW1** worked for TG Therapeutics from May 2021 to April 2022 as an Associate Director of Medical Writing. CW1 reported to Vice President of Clinical Research and Operations who in turn reported to Chief Operating Officer Peter Sportelli and in turn reported to Chief Executive Officer and Individual Defendant Weiss. CW1's responsibilities included "collating" documents in responses to the FDA such as medical brochures and clinical reports. CW1 recalled attending monthly Company-wide townhalls where most senior leadership were present, including Individual Defendant Weiss, who also hosted his own townhall-like monthly meetings, that were called "Fireside Chats with Michael Weiss," or a name similar to that. Further, CW1 also recalled that the regular townhalls were led by Chief Operating Officer, Peter Sportelli[5] and Chief Development Officer, Hari Miskin. CW1 recalled Sportelli had updated the Company around mid-December 2021 at a Company-wide townhall that "TG may decide to pull the BLA."

61. **CW2** worked for TG Therapeutics from prior to the beginning of the Class Period through the beginning of 2022 as part of the Clinical Research team that reported into Michelle Purdom, who was the Vice President of Clinical Research and Operations. CW2's responsibilities included organizing and taking the minutes at TG Therapeutics' Study Execution Meetings along

---

[4] CWs are identified herein by number (CW1, CW2, etc.). All CWs are described in the masculine to protect their identities.

[5] Peter Sportelli ("Sportelli") has served as TG Therapeutics' Chief Operating Officer at all relevant times. Prior to working for TG Therapeutics, Sportelli was involved in a fraudulent scheme to defraud the public and the FDA while working at another pharmaceutical company, Cell Therapeutics, LLC ("Cell Therapeutics"). Specifically, while at Cell Therapeutics, Cell Therapeutics sued Sportelli, accusing him of fraudulent behavior, including sending two checks to entities Sportelli controlled, totaling $114,500 for services that were never rendered. Sportelli was convicted of wire fraud as a result of the incident.

with some of the Oncology Clinical Trial Site meetings. He explained that much of his time was spent writing and editing the minutes from those meetings. Further explaining that the minutes had to be reviewed and edited by all of the employees that attended the meeting and ultimately, they were preserved in TG Therapeutics' online filing system which was maintained by the Company's Regulatory department. According to CW2, the initial minutes for a call were provided in the form of questions or points from expected attendees and that these would be forwarded to the other attendees ahead of the call. These minutes, as well as the responses and discussions that developed from them, were kept as a record and entered into the system after the recap ended. CW2 added that the study lead for each trial was responsible for organizing, distributing, and entering the minutes into the system. CW2 was also exposed to the details of any adverse reactions, events or deaths discussed on the Site Calls, which were "captured in TG Therapeutics' database." He emphasized that on the Site Calls, "every single site" reported everything that occurred at their site including any adverse reactions, such as patients dying. CW2 advised that the Company's upper management were on those calls including Michelle Purdom, Sportelli, and Miskin.

62. **CW3** was formerly employed by TG Therapeutics from November 2020 to August 2021 as a Clinical and Trial Master File ("TMF") Operations Associate. CW3 advised that in final reporting structure he reported to both Clinical and TMF Operations Manager Carley Cummings and Director of Clinical and TMF Operations Ashlyn Deshaies. CW3 added that he was also involved in data collection on the U2 trials for CLL patients from 2 or 3 trial sites, and that this included receiving data on adverse events from those 2 – 3 sites as well as distributing that adverse event data to the other 60 or so sites combined in all of the U2 and MS trials. CW3 explained that he was uncomfortable working at TG Therapeutics due to perceived regulatory deficiencies by the Company and that the deciding factor to leave the Company was when he learned from a manager

that COO Peter Sportelli had previously been charged for misleading shareholders when he had been employed by another oncology company called Cell Therapeutics

63. **CW4** was employed by TG from February 2021 until January 2022 as a Clinical and TMF Associate. CW4 was responsible for receiving documents from the trials and ensuring that they had been filled out completely and then filed them within TG's electronic filing system.

**(b) Plaintiffs' Expert Consultant**

64. Suzanne M. Sensabaugh ("Sensabaugh") is President and Principal Consultant of HartmannWillner, where she is an FDA regulatory affairs and Good Manufacturing Practices ("GMP") consultant. She has over 30 years of experience in regulatory affairs, drug development, and FDA compliance with a focus on biologics, biosimilars, and biologics/device combination products. Sensabaugh received her MBA from Duke University, MS from Johns Hopkins University, and BS from the University of Maryland. Sensabaugh is also a former Adjunct Faculty member at Johns Hopkins University.

65. Sensabaugh has over 10 years of experience working at the at the FDA, including at the Center for Biologics Evaluation and Research ("CBER"), where she worked as a researcher, product reviewer, and inspector for biologic applications from drug sponsors.

66. Sensabaugh's professional experience as a FDA regulatory affairs consultant, includes working on the designing, running and completion of Phase 1, 2 and 3 clinical trials as well as the data analysis and submission of Investigational Drug Applications ("INDs"); Biologics License Applications ("BLAs"); New Drug Applications ("NDAs"), including under 505(b)(2); clinical trials; chemistry, manufacturing and controls ("CMC"); comparability; preclinical ("pharmacology/toxicology"); Orphan Drug designations; product labeling; and expedited safety adverse event reporting.

67. Since forming HartmannWillner in 2009, Sensabaugh has assisted in the development of over 130 products as a regulatory affairs consultant and GMP consultant. This includes the development of over 25 biosimilar products and over 30 FDA GMP audits. In addition, she has provided FDA regulatory consultant expertise to product development advisory boards, investment management and venture capital firms, and global management consulting firms. Over the course of her distinguished career, Sensabaugh has served as an expert witness numerous times on FDA regulatory affairs and GMP compliance matters.

## IV. SUBSTANTIVE ALLEGATIONS

### A. TG Therapeutics' Future Depended on The Success of Its Flagship Cancer Drugs, UKONIQ and U2

68. Defendant Weiss founded TG Therapeutics in December 2011. TG Therapeutics is a New York City based biopharmaceutical company that focuses on the acquisition, development, and commercialization of treatments for B-cell malignancies and autoimmune diseases such as cancer and MS. The Company's most advanced therapeutic product candidates include: (1) Umbralisib ("UKONIQ"), and (2) Ublituximab.

69. Umbralisib, is an oral, once-daily dual inhibitor of PI3K-delta and CK1-epsilon that treats FL and MZL, which are forms of NHL. Ublituximab, is an antibody that utilizes B-Cell targeting to treats RMS, which is a chronic disease of the central nervous system. However, TG's drug with the most commercial potential was a treatment combination of both Umbralisib and Ublituximab which the Company referred to as "U2." U2 was being tested to treat CLL, FL, and MZL but had the potential to translate to several other B-Cell disorders which, if successful, would significantly expand the number or potential customers TG could market and sell the drug to.

70. Investors and analysts understood the blockbuster potential of U2. For example, an August 7, 2018 SunTrust analyst report touted the importance of the then-ongoing U2 clinical

trial called UNITY-CLL: "**[g]iven the blockbuster market potential for U2** in **CLL, and potential read-through to other indications (iNHL, MS)**, we think positive UNITY-CLL data could lead to substantial (100%+) appreciation in TGTX's share price." Likewise, according to a Jefferies analyst report, published on December 17, 2019: "**A successful UNITY-CLL paves the path for U2 to gain dominance in the CLL market as a backbone of future combos. A successful UNITY-CLL would be transformative to TG . . .**"

71. Prior to the start of the Class Period, TG Therapeutics had not received approval for the sale of any of the Company's drug candidates in any market and, therefore, had not generated any product sales or meaningful product revenue from its drug candidates. And while the Company had a few other drug candidates under development (cosibelimab, TG1701, and TG1801), those drugs were still undergoing early Phase 1 trials and were, therefore, years away from commercialization and generating revenue for the Company. Moreover, those drugs relied heavily on the B-cell science behind Ublituximab and Umbralisimab and were only likely to succeed if Ublituximab, Umbralisimab, and U2 were proven to be safe and efficacious.

72. The following table summarizes TG Therapeutics' drug candidates and the stage of their development as of the beginning of the Class Period.

| Clinical Drug Candidate | Target Disease | Stage of Development (trial name) |
|---|---|---|
| Umbrasilib (UKONIQ) | Marginal Zone Lymphoma (MZL) | Phase 2b trial (UNITY-NHL) |
| | Follicular Lymphoma (FL) | Phase 2b trial (UNITY-NHL) |
| Ublituximab | Relapsing Multiple Sclerosis (MS) | Phase 3 trials (ULTIMATE I and II) |
| U2 (Umbralisib + Ublituximab) | Chronic Lymphocytic Leukemia (CLL) | Phase 3 trial (UNITY-CLL) |
| | Marginal Zone Lymphoma (MZL) | Phase 2b trial (UNITY-NHL) |
| | Follicular Lymphoma (FL) | Phase 2b trial (UNITY-NHL) |
| Cosibelimab | B-cell cancers | Phase 1 trial |
| TG-1701 | B-cell cancers | Phase 1 trial |
| TG-1801 | B-cell cancers | Phase 1 trial |

73. Financial commentators touted the importance of Ublituximab, Umbralisimab, and U2 to the company's future revenues and growth. For example, a Seeking Alpha article published on June 26, 2019, stated:

> [i]t is not unusual in bioscience investing to observe a stock that remains dormant for years and thereby tests the investor's patience to the extreme. Nonetheless, all bets are off when a series of powerful catalysts approach to galvanize the bulls for a historic run. **TG Therapeutics (NASDAQ:TGTX) epitomizes the aforementioned phenomenon**. Despite that shares are trading on an uptrend for the past six months, the stock remains relatively flat for the past two years. **Since TG will report data for its lead molecules (ublituximab, umbralisib), I strongly believe that this stock is positioned for a substantial rally**.

74. However, UKONIQ, and by extension U2, were being highly scrutinized by the FDA, the pharmaceutical industry, and investors alike. While promising, the pharmaceutical technology behind UKONIQ—known as a PI3K inhibitor—was understood to be a dangerous treatment option, because inhibiting the PI3K receptor leads to significantly increased risk of serious infection and associated toxicity, which can elicit dangerous side effects. For instance, a Cantor Fitzgerald analyst report published on November 6, 2019, entitled, "ASH updates incremental positive, but remain positive into UNITY-CLL update" stated, "Investment Thesis: "We think both umbralisib and ublituximab are clinically de-risked, but investors remain cautious on market potential. **Although the PI3K commercial landscape in particular has been historically challenging due to class safety issues, we think umbralisib's safety profile is differentiated**. We think TG has a potentially best-in-class PI3K and other pipeline assets that make attractive oncology and autoimmune combinations. We think safe, late-stage assets with proven activity will allow for many future novel combinations that would be upside to our current valuation. We think investors will give more credit to the stock as the Ph3 data accrues across multiple indications."

### B. TG Therapeutics Conducted Clinical Trials to Demonstrate Substantial Evidence of Safety and Effectiveness

75. While investors were understandably excited about the promise shown by Ublituximab, Umbralisimab, and U2, TG still needed to get FDA approval before it would be able to sell any of the drugs and generate any revenues therefrom. To do so, the Company was required to complete multiple lengthy and expensive clinical trials in order to generate enough safety and efficacy data to demonstrate to the FDA that the treatments should be approved for commercialization. That data and the statistical analysis of that data, proving safety and efficacy of a drug, is submitted to the FDA in an NDA or, in the case of a biologic drug, a BLA.

76. A properly submitted NDA or BLA provides the FDA with all pertinent information about the drug, including data and statistical analyses sufficient to determine: (1) whether the drug is safe and provides the benefits it purports to; (2) whether the benefits of the drug outweigh its risks; (3) whether the drug's proposed labeling is appropriate and what it should contain; and (4) whether the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity. Although safety and efficacy are important in the FDA's assessment, each of these issues is independently critical to the agency's overall determination as to whether a drug should be approved for marketing and sale in the U.S.

77. In order to meet these standards, drug developers typically subject a drug candidate to a series of clinical trials designed to accumulate the data required to submit a successful NDA to the FDA. Phase 1 clinical trials typically evaluate an investigational drug's safety and dosage tolerance. Phase 2 clinical trials usually involve larger patient populations and evaluate dosage tolerance and appropriate dosage; identify possible short-term adverse effects and safety risks; and provide a preliminary evaluation of the efficacy of the drug for specific indications. Phase 2 clinical trials are sometimes done in multiple sub-phases denoted as Phase 2a and Phase 2b. Phase 2a trials are typically smaller and provide additional introductory information on drug safety and efficacy. Phase 2b clinical trials are usually larger and may be for longer durations of time. More importantly, in most Phase 2b trials an investigational drug's efficacy is measured against a control. Finally, Phase 3 clinical trials test for efficacy and safety in an even further expanded patient population. Phase 3 trials also usually involve comparison with a control and are intended to establish the overall risk-benefit profile of the product as well as provide an adequate basis for physician labeling.

78. As described in the chart above, during the Class Period, TG Therapeutics was undergoing several clinical trials related to Ublituximab, Umbralisimab, and U2 for the treatment of cancer and other B-Cell disorders. The trials were known as UNITY-CLL, UNITY-NHL, ULTRA V, ULTIMATE I, and ULTIMATE II.

**1. UNITY-CLL Clinical Trial**

79. The UNITY-CLL trial was TG Therapeutics' most advanced and important trial meant to test the efficacy of U2 as a cancer treatment for CLL. The UNITY-CLL Phase 3 clinical trial enrolled participants from February 2016 to October 2017. The trial had over 600 patients across four treatment arms, with approximately 420 patients in the U2 and the active control arm combined. UNITY-CLL was a randomized, open label, multicenter Phase 3 trial assessing U2, for the treatment of CLL.

**2. UNITY-NHL Clinical Trial**

80. The UNITY-NHL trial was TG Therapeutics' other critical advanced oncology trial that tested the use of both the U2 combination and UKONIQ alone for the treatment of MZL and FL. The UNITY-NHL clinical trial enrolled participants from May 2016 to July 2022 with approximately 900 total participants. The UNITY-NHL trial was a randomized, open-label, multicenter Phase 2b trial for the treatment of MZL and FL.

**3. Other Related Trials**

81. During the Class Period, TG Therapeutics also conducted: (1) the ULTRA-V trial which was a Phase 2b clinical trial designed to investigate the efficacy and safety of U2 combined with a drug called venetoclax in subjects with treatment-naïve and relapsed or refractory CLL; and (2) the ULTIMATE I and II Phase 2b clinical trials to study the effects of Ublituximab on subjects with relapsing forms of MS.

### C. TG Therapeutics Applied for and Received FDA Designations Giving Investors the Impression that the Company was Working Closely With the FDA

82. Prior to and throughout the Class Period, Defendants applied for and obtained a number of advantageous designations offered by the FDA including Orphan Drug status, breakthrough therapy status, Fast Track, and SPA designations. Such designations expedited the process for approval and provided TG Therapeutics with special access to FDA officials that could consult with the Company on the design and rollout of its clinical trials as well as data submissions in connection with its NDA and BLAs. Because these designations gave companies like TG Therapeutics the ability to work closely with the FDA on its trials and submissions (and get the FDA's buy in as a result), it significantly improved the chances of the drugs' approval--so long as the Company was transparent with the FDA about the clinical trials and resulting data.

83. Accordingly, prior to and throughout the Class Period, Defendants touted these designations as some of the major selling points to investors in the Company based on the future success of Umbralisib, Ublituximab, and U2. Moreover, Defendants touted the fact that the Company was working closely with the FDA to assure investors that FDA approval of its drugs was likely. For example, in a January 16, 2020 press release, Defendants told investors about guidance it received from the FDA about its NDA application for UKONIQ for MZL and FL noting: "The Company has received guidance from the FDA that submission of a single NDA for both the MZL and FL indications is acceptable."

84. Analysts understood TG Therapeutics was working closely with the FDA and that cooperation was helpful to the expeditious approval of TG Therapeutics' drug candidates. For instance, a Jefferies analyst report published on March 1, 2022 expressed surprise at one of Defendants' disclosures about UKONIQ's safety issues specifically because Defendants had touted its preferential access to the FDA: "[t]his was a surprise to us…as [TG Therapeutics] had a

SPA in place, and of course the UNITY-CLL trial was seemingly a resounding success." Further, the report went on to emphasize that, "[TG Therapeutics] has [Breakthrough Therapy Designation] so is able to take these data to the FDA to evaluate the study design and potentially speed the development timeline."

### 1. TG Therapeutics Obtains Orphan Drug Designations for Umbralisib, Ublituximab, and U2

85. Orphan drug designation is granted by the FDA to drugs and biologics which are defined as those intended for the safe and effective treatment, diagnosis or prevention of rare diseases/disorders that affect fewer than 200,000 people in the U.S. Orphan drug designation provides certain incentives and if a product that has orphan drug designation subsequently receives the first FDA approval for the disease for which it has such designation, the product is entitled to orphan drug exclusivity.

86. Prior to the start of the Class Period, on March 5, 2020, TG Therapeutics announced that it had received orphan drug designation for Umbralisib from the FDA for the treatment of FL. TG Therapeutics had also previously obtained orphan drug designation for Umbralisib and the treatment of MZL.

87. Investors understood the importance of Orphan Drug status. For example, an article from financial news outlet Seeking Alpha published on December 12, 2013 titled, "Orphan Drug Designations: Why You Should Care," stated, "FDA-designated orphan drugs have a higher likelihood of approval relative to other drugs…it seems to be appreciated at least in part by the market, given the share price increases that occur and persist in the aftermath of an orphan drug designation." Further, the article also stated that, "[t]he general conclusion…is that if you are successful at developing Orphan drugs, you move from the reigns of 'small-cap biotech' to 'mid-cap pharmaceutical' pretty quickly."

### 2. TG Therapeutics Obtains Breakthrough Therapy Designation for Umbralisib

88. Similarly, Defendants obtained Breakthrough Therapy designation for UKONIQ, which provided an advantage of previewing data with the FDA as well as working with them prior to submitting a NDA or BLA. According to the Company's March 1, 2022 Form 10-K "[t]he procedures and requirements for [Breakthrough Therapy Designation]…**is intended to expedite the development and review of a potential new drug for serious or life-threatening diseases**, however, with [Breakthrough Therapy Designation], there is a further requirement that the sponsor present 'preliminary clinical evidence' which 'indicates that the drug may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints, such as substantial treatment effects observed early in clinical development.'"

### 3. TG Therapeutics Obtains "Fast Track" Designation for U2

89. Defendants also applied for and were granted Fast Track approval for the combination drug U2. Fast track is intended to facilitate the development and expedite the review of drugs intended to treat serious conditions and unmet medical needs. TG Therapeutics' Fast Track designation enabled the Company to take advantage of numerous benefits which were otherwise unavailable to other drug candidates, including: (1) frequent meetings with FDA to discuss the drug's development plan and ensure collection of appropriate data needed to support drug approval; (2) frequent written communication from FDA about such things as the design of the proposed clinical trials and use of biomarkers; and (3) rolling review, which allows a drug company to submit an NDA for review as data analyses and other portions of the application come in (rather than waiting for every element of the NDA to be finished before the entire application can be reviewed). According to the FDA's guidance:

> Once a drug receives *FastTrack* designation, early and frequent communication between the FDA and a drug company is encouraged throughout the entire drug

development and review process. The frequency of communication assures that questions and issues are resolved quickly, often leading to earlier drug approval and access by patients.

90. Analysts understood that Fast Track designation signals a higher probability of a drug manufacturer's FDA approval for its drug candidate and that the drug will be approved more quickly than it would have if it were not granted Fast Track status. For example, an April 21, 2021 H.C. Wainwright & Co. analyst report stated that, "**we believe the Fast Track Designation puts [U2] on the right path for a potential launch late this year**."

#### 4. TG Therapeutics Obtains Special Protocol Assessment Designations for U2

91. Finally, TG Therapeutics conducted the UNITY-CLL trial under a Special Protocol Assessment ("SPA"). According to an FDA guidance on SPA agreements, "**an SPA agreement indicates concurrence by FDA with the adequacy and acceptability of specific critical elements of overall protocol design (e.g., entry criteria, dose selection, endpoints, and planned analyses) for a study intended to support a future marketing application.**"

92. During the December 10, 2020 special conference call with investors to discuss clinical trial results, Individual Defendant Weiss explained to investors that an SPA "**is a[n] assessment that the FDA does. And you agree on the protocol, the design, the endpoints and the -- and all the pieces actually of the protocol**." Furthermore, he assured investors that having such an SPA, especially in support of a BLA submission, could infer better approval odds – "**we feel confident that, that gives us the comfort that what we've done in our clinical trials should support the BLA submission, obviously, assuming they agree with our assessment of the data, but the study design and endpoints should not be an issue**."

93. Analysts also understood the importance of the SPA to the ultimate approval of U2. For example, Jefferies reported on December 17, 2019, that "**UNITY-CLL has been conducted under a SPA w/ the FDA, ensuring regulatory buy-in in place**."

94. However, an SPA dictates that the burden is still on the drug sponsor, TG Therapeutics, to share critical information with the FDA to appropriately assess the drug's safety and efficacy. According to the FDA:

> [T]he presence of an SPA agreement, does not guarantee that a marketing application will be filed or approved, even if the trial is conducted in accordance with the protocol. When an application is submitted, FDA reviews the application to make a threshold determination that the application is sufficiently complete to permit a substantive review; the fact that a trial conducted pursuant to an SPA agreement forms the basis of an efficacy claim in the application does not mean that the application in its entirety meets the criteria in 21 CFR 314.101 (for NDAs) or in 21 CFR 601.2 (for BLAs) with respect to filing the application. After an application has been filed, FDA reviews it to evaluate whether the submitted evidence in the application as a whole meets the statutory standard for approval. Although, as set forth in the SPA provisions in the FD&C Act, FDA will not change its position regarding the critical design elements agreed to as part of an SPA agreement unless a substantial scientific issue essential to determining the safety or effectiveness of the product has been identified after the trial begins and the sponsor is notified of such . . . **the existence of an SPA agreement does not mean that the application as a whole will meet the statutory standard for approval**.

## D. TG Therapeutics Was Required to Report Adverse Events and Serious Adverse Events Associated with its Drug Candidates

95. The FDA ensures that drug candidates being tested in clinical trials are safe by requiring drug sponsors, like TG Therapeutics, to report any adverse events (*i.e.* AEs) or serious adverse events (*i.e.* SAEs) within a certain time period. Drug sponsors running clinical trials and applying for approval to the FDA are required to report serious adverse events (which are also suspected and unexpected) especially deaths, to the FDA through the FDA Adverse Event Reporting System ("FAERS"). FDA requires adverse event reporting within 15 days of serious and life-threatening events that are unexpected and suspected through FAERS but does not require

disclosure to the public at large. Deaths must be reported on an expedited basis (within 7 days) and FDA regulations determine whether a case is serious. [6]

96. Once a drug sponsor reports an adverse event or serious adverse event, it is incumbent upon the drug sponsor to then investigate the event and determine whether or not the event was attributable to the drug candidate or some other cause. Accordingly, it was TG Therapeutics' responsibility to both report all AEs and SAEs, and then investigate whether those deaths were attributable to TG Therapeutics' drugs, *i.e.*, Umbralisib, Ublituximab, or U2. Ultimately, TG Therapeutics needed to furnish the results of its investigation into the cause of reported AEs and SAEs when providing the FDA with data on the safety of its drugs, including Overall Survival ("OS") statistics and Hazard Ratios ("HR").

97. The FDA also determines the amount and type of data that needs to be collected and preserved the safety of a drug to be analyzed. According to an FDA guidance, entitled, "Determining the Extent of Safety Data Collection Needed in Late Stage Premarket and Post approval Clinical Investigations," under the section titled, "Types of Safety Data That Should Always Be Collected," the FDA explains that, "[s]ponsors should be aware that the following types of data are generally not appropriate for selective safety data collection and **should always be collected**: [d]ata on all serious adverse events; [d]ata on non-serious adverse events that lead to dose modification, drug discontinuation, or withdrawal from the trial; [d]ata on unscheduled study visits, hospitalizations, and accidental injuries because these events may reflect serious adverse

---

[6] According to FDA regulations, after a drug is approved and is being sold commercially drug sponsors are required to report AEs and SAEs in a substantially similar manner as they would during a clinical trial. For example, pursuant to 21 C.F.R. §314.80, the drug sponsor must submit to the FDA adverse drug experience information and serious adverse drug experience information. The sponsors must do so within specified timeframes and must also perform investigations of adverse events and must "promptly review all adverse drug experience information obtained or otherwise received by the applicant from any source."

events of the drug…" The FDA differentiates oncology drugs and states that "in an oncology setting, data from all Grade 3 and Grade 4 adverse events, as well as Grade 2 adverse events that affect vital organs (e.g., heart, liver)" should always be collected.[7]

### E. TG Therapeutics Knew There Were Increased AEs and SAEs in Connection with Its Oncology Drugs, UKONIQ and U2

98. Contrary to Defendants' Class Period statements about U2 and UKONIQ's supposedly safe PI3K profiles, beginning in 2020 patients taking the drugs began experiencing SAEs at an alarming frequency, with many leading to hospitalization and death. Indeed, according to an FDA adverse event report for UKONIQ obtained through a FOIA request, prior to and during the Class Period, between February 26, 2019 to December 31, 2021, there were a total of 150 reported AEs related to the use of UKONIQ. Of those 150, 44% (66) of the AEs reported between February 26, 2019 and December 2021 were SAEs (*i.e.,* serious, unexpected adverse events including death, hospitalization, and life-threatening illness). *See* FDA AE Report attached hereto as Exhibit 2. Of the SAEs, the report explained that 19 resulted in death and no less than 50 resulted in hospitalizations. Furthermore, only 6 of the 150 reports by TG Therapeutics were reported as COVID related.

99. According to Sensabaugh, given the number of deaths in such a short period of time, the data contained in TG Therapeutics' AE reports indicated an alarming level of AEs and especially, SAEs, even for an oncology drug. Notably, the reports showed a cluster of deaths related to taking UKONIQ in an extremely short period of time, which should have raised a red

[7] Adverse events are graded on a scale from 1 to 5. Grade 1 adverse events are mild and generally not bothersome. Grade 2 events are bothersome and may interfere with doing some activities but are not dangerous. Grade 3 events are serious and interfere with a person's ability to do basic things like eat or get dressed. Grade 3 events may also require medical intervention. Grade 4 events are usually severe enough to require hospitalization and Grade 5 events indicate death.

flag to both the Defendants and the FDA related to UKONIQ's safety profile. Specifically, from June 23, 2021 to December 1, 2021, **there were no less than 11 deaths during a five and a half month period**.

### F. TG Therapeutics Recorded Safety Data from Clinical Trial Sites and Discussed Results at Weekly and Monthly Calls with Executives in Attendance

100. According to numerous former TG Therapeutics employees, the Company recorded the adverse event results, entered the information into an internal filing system and presented the data to executives. For example, CW2 advised that he was responsible for organizing and taking the minutes at TG Therapeutics' Study Execution Meetings along with some of the Oncology Clinical Trial Site meetings. He explained that much of his time was spent writing and editing the minutes from those meetings and that the minutes had to be reviewed and edited by all of the employees that attended the meeting and ultimately, the minutes were preserved in TG Therapeutics' online filing system, maintained by the Company's regulatory department.

101. With respect to Study Execution Meetings, CW2 went on to say that the meetings were held at varying cadences, sometimes weekly, monthly, or quarterly and were focused on the Oncology studies at TG Therapeutics. According to CW2, each Study Lead ran the trial calls, and that CW2 assisted with the minutes and itinerary that had to be signed off by each attendee. CW2 recalled that several people from TG's Safety Department were on each trial call. CW2 added that safety was **always** a topic on these calls. CW2 advised that there were 10-14 departments within Oncology that had representatives at these meetings including Regulatory, Clinical Operations, Clinical Research, and others. CW2 recounted that approximately 20-30 TG employees attended these meetings. According to CW2, the Study Execution Meetings were almost like a recap of what was happening at each of the sites and that the meetings were "very detailed" with specific

information about adverse events and deaths that occurred at the sites, including charts and tables that detailed specifics related to those metrics.

102. CW2 explained that these calls were organized by the "Study Lead" and on these calls all data was discussed and the doctors from each site would provide details related to any adverse events or deaths that had occurred. CW2 recalled extremely detailed minutes taken on those calls. According to CW2, the minutes from the Site Calls were also preserved by TG Therapeutics' regulatory department.

103. CW2 went on to say that all the details of any adverse reactions, events or deaths discussed on the Site Calls were "captured in their [TG's] database." He emphasized that on the Site Calls, "every single site" reported everything that occurred at their site including any adverse reactions and if patients had died. Further, CW2 reiterated that TG Therapeutics' upper management was on those calls including his boss, Michelle Purdom. Further, he explained that current COO Peter Sportelli and Current CDO Hari Miskin were likely on some of the UKONIQ trial calls.

### G. Defendants Repeatedly Touted the Safety of TG Therapeutics' Drugs While Failing to Disclose the Serious Safety Issues Associated with UKONIQ and U2

104. The Class Period begins on February 5, 2021. On that date, TG Therapeutics issued a press release announcing the FDA's accelerated approval of UKONIQ for treating MZL and FL and signaling the commercial launch of the drug in the United States. In the Press Release, Defendant Weiss touted the approval of the drug and explained to investors the Company's plan to begin selling the drug to patients. "***Today's approval of UKONIQ marks a historic day for our Company with this being our first approval and we are extremely pleased to be able to bring our novel inhibitor of PI3K-delta and CK1-epsilon to patients with relapsed/refractory MZL and FL.*** We have built a commercial team with significant experience who will immediately start to

engage our customers to educate them on UKONIQ and how to access the product for patients in need and expect to make UKONIQ available to US distributors in the next few days."

105. However, Defendants' statements touting the approval and commercialization of the drug were false and misleading because they failed to disclose the increase in serious adverse events the Company was seeing and reporting to the FDA related to UKONIQ at that time. Specifically, by February 5, 2021, **the Company reported <u>four</u> new SAEs** that resulted in hospitalization or "other serious important medical event" in the prior six months—a sharp uptick when compared to the preceding two-year period.

106. The same day, Defendants held a conference call with investors further touting the FDA approval and playing up UKONIQ's supposedly superior safety profile as compared to other PI3K inhibitor drugs. Specifically, Defendant Waldman stated: "And I think in previous launches around PI3K, that might not have been really well done**.** ***I think we do have a differentiated product. I think that, that may be another point of differentiation here from the previous launches. We think our safety profile is very different***."

107. However, in addition to omitting the uptick in SAEs the Company reported in the past six months, Defendant Waldman's statements gave investors the false impression that UKONIQ was superior to other PI3K inhibitor drugs because its "safety profile is very different," when in reality its safety profile suffered from the same toxicity and tolerability drawbacks that other PI3K cancer drugs did, as evidenced by the increase in SAEs. As the Class Period progressed, the frequency of SAEs would only continue to mount yet the Company would continue to make positive statements about UKONIQ and U2 as well as their efficacy despite clear indications that UKONIQ was not safe.

108. Analysts relied on Defendants' false and misleading statements touting the purportedly differentiated safety profile of UKONIQ. For example, an H.C. Wainwright & Co. analyst report published on February 8, 2021 titled, "Umbralisib, Now Ukoniq, Approved in MZL and FL Patients; Raising PT by $1," stated, "Approval based on impressive data… We believe the safety profile of Ukoniq is differentiated from other PI3K inhibitors." Further, a Jefferies analyst report published the same day titled, "Early Approvals in MZL/FL Suggest Value-Creation Throughout '21; Reiterate Buy," acknowledged that, "Ukoniq is approved for FL/MZL, with a clean and differentiated label, supporting a strong launch. While the approvals of Ukoniq (umbralisib) in both FL and MZL are largely anticipated, we see a few positive accounts that could support a strong launch: 1) Unlike other oral PI3Kis (e.g., idelalisib, duvelisib), Ukoniq does not carry blackbox warnings such as infections, diarrhea/colitis, pneumonitis, liver tox, etc."

109. Thereafter, in February 2021, **two more SAEs were reported by the Company to the FDA**. Both resulted in hospitalization of the patient and one of them was life-threatening. Yet, during the Company's 4Q 2020 earnings press release on March 2, 2021, Defendant Weiss continued to tout positive results from the UNITY-NHL trials and the commercialization of UKONIQ stating: "2020 was a year of data and regulatory execution for us as ***we delivered results from our UNITY-NHL study that led to the approval of UKONIQ in relapsed/refractory MZL and FL and from UNITY-CLL that will be used to support the current rolling BLA submission for ublituximab in combination with umbralisib for patients with CLL.***"

110. Likewise, that same day, Defendant Weiss told investors during the 4Q 2020 earnings conference call that, "***For UNITY-CLL, we presented data demonstrating that U2 achieved the primary endpoint of improving progression-free survival over standard of care chemoimmunotherapy and those results were consistent for patients with treatment naïve CLL,***

***as well as relapsed or refractory CLL***." Investors reacted to the positive results and saw UKONIQ as a highly promising PI3K inhibitor compared to competitor drugs. For instance, a Cantor Fitzgerald analyst report published on March 3, 2021 titled, "4Q Take: UKONIQ early launch trends seem positive," stated, "Most important, in our view, is that the physician feedback seems positive so far, and there is a perception of differentiation from the PI3K class. As we have often discussed, the PI3K delta class has some negative baggage associated with it on toxicity. However, UKONIQ did not see high levels of the typical GI- and liver-related toxicity. As we highlighted at approval (see here), their label did not include the typical black box warnings of the class."

111. By May 15, 2021, **TG reported <u>three</u> more SAEs to the FDA** related to use of UKONIQ all of which resulted in hospitalization and **one that resulted in the death of the patient**. Nonetheless, Defendants continued to tout the safety and efficacy rates resulting from the clinical trials. For instance, during TG Therapeutics' 1Q 2021 earnings conference call, Defendant Waldman told investors that, "***Through market research, advisory boards, and our field team engagements, we have confirmed that UKONIQ is a different – is seen as a differentiated product. We've consistently heard that the proven efficacy across marginal zone and follicular, its unique MOA, tolerable safety profile, low rates of discontinuation, and a lack of a black-box warning are important differentiators with health care providers and payers. We believe that these factors help establish UKONIQ in a class of its own***."

112. In the Summer of 2021, the number of SAEs continued to climb with even greater momentum. **In June 2021, the Company reported <u>five</u> more SAEs, including two deaths** and two events that resulted in disability related to the use of UKONIQ**. In July 2021, TG Therapeutics reported <u>seven</u> additional SAEs, including the death of three more patients.** And in August 2021, the Company reported an astonishing **<u>ten</u> additional SAEs with four**

**additional patient deaths** as well as numerous events that resulted in life threatening circumstances, hospitalizations, and disability. Despite the remarkable uptick in serious adverse events and patient deaths, the Company continued to make positive statements about the safety and efficacy of UKONIQ and its related oncological applications despite knowing the severe safety concerns the drug posed to patients.

113. The market believed and heavily relied on TG Therapeutics' statements regarding the safety of UKONIQ compared to other PI3K inhibitors. For example, a Cantor Fitzgerald analyst report dated March 10, 2022 and titled, "Model update heading into panel," stated, "We think [TG's] U2 regimen in CLL remains differentiated specifically around the safety of their PI3K umbralisib. However[,] we do worry that the FDA may express more broad class concerns that impacts the U2 regimen by default. We have lowered our probability of success from 60% to 50% for CLL. We have also lowered our hematology estimates across the board. We think upside comes from approval and launch of ublituximab (their CD20 in MS). Its potential approval is Sept 28, and we remain positive on the approval."

114. For example, on August 2, 2021, TG Therapeutics hosted the 2Q 2021 earnings conference call with investors touting the progress the Company had made based on the success of UKONIQ. During the earnings call, Defendant Weiss touted the success of the UKONIQ clinical trials stating, in relevant part:

> ***With the first phase of our multi-phase strategy now complete with the accelerated approval of the UKONIQ, the first and only dual inhibitor, a PI3K-delta and CK1- epsilon for the treatment of relapsed or refractory marginal zone lymphoma and follicular lymphoma***. We are very proud of these accelerated approvals for patients who have failed prior therapies and have limited treatment options.

115. However, like their prior statements, Defendants' positive statements about UKONIQ and its viability as a PI3K inhibitor for cancer treatment were false and misleading

because they failed to mention the severe uptick in SAEs and deaths the Company knew were occurring and thus, significantly discounted the risk such events posed to UKONIQ's continued commercial viability. Analysts relied on these misrepresentations as demonstrated in an Evercore ISI analyst report and presentation published on August 2, 2021, which described TG Therapeutics' 2Q 2021 earnings and outlook. Specifically, "UKONIQ's Safety is a Key Differentiator…: UKONIQ has a cleaner safety profile vs. approved PI3K inhibitors and INCY's parsaclisib (keep an eye on MEIP's zandelisib). So far, PI3Ks have had minor impact on treatment landscape due to worrying toxicities (neutropenia, colitis) and high discontinuation rates that increase over time but newer products such as Ukoniq seem to have addressed that."

116. Notably, Defendants knew that the increase in SAEs would (and did) raise flags to the FDA that was already concerned about the increased risk posed by PI3K inhibitor cancer treatments. Moreover, according to Sensabaugh, the FDA would have been monitoring the SAEs closely because of the significant number of deaths that had occurred in such a short period of time. Further, such data would have been alarming to the FDA and raised red flags.

### H. The FDA Responds to the Increased Number of SAEs Resulting from Patients taking UKONIQ and U2 as Patients Continue to Die at Alarming Rates

117. As the Company would later admit to the public, in September 2021, the FDA issued a request to the Company to conduct an analysis of overall survival in connection with the UNITY-CLL trial, which was still ongoing at that time. However, the Company's ability to demonstrate the safety of UKONIQ to the FDA proved more difficult over the course of the month of September because **TG Therapeutics reported an additional <u>seven</u> SAEs, including another death of a UKONIQ patient.**

118. Internally, the Defendants acknowledged the seriousness of the SAEs. Specifically, CW4 recalled that in approximately September 2021 there was a mandatory company-wide Zoom call

where current CEO Mike Weiss addressed a "pocket of SAEs (Serious Adverse Events)" related to UKONIQ and again employees were provided the same rationale that the deaths were due to COVID rather than TG's drug. Moreover, CW4 continued to say that employees were told that TG would need to put their clinical trials on hold until they were able to provide evidence that the deaths were not due to UKONIQ, but instead due to COVID or other unrelated factors.

119. Likewise, the Company understood the FDA inquiry was as crucial. For example, CW3 recalled TG Therapeutics gearing up for a big and important FDA audit that was to take place around early November 2021. CW3 went on to recall that sometime in earlier 2021, in preparation for that audit, he had to reconcile data on adverse events from the Unity trials, and that this data reconciliation included showing that he and his colleagues were enforcing that each site's Investigator was aware of every adverse event. CW3 also recalled that the time of the audit was very hectic at the Company.

120. Yet, on September 23, 2021, the Company issued a press release touting the safety of UKONIQ, while omitting the months' worth of evidence that UKONIQ was not safe but was killing and hospitalizing patients at an alarming rate. Specifically, on September 23, 2021, the Company issued a press release entitled "TG Therapeutics Announces Publication of Results from an Integrated Safety Analysis of UKONIQ (umbralisib) in Blood Advances." Therein, Defendants touted UKONIQ's safety profile based on purportedly "comprehensive toxicity data" from the Company's past clinical trials. The release quoted Defendant Weiss as stating:

> We are pleased that the integrated safety analysis of 371 patients treated with UKONIQ has been published in *Blood* Advances. ***We believe these data further support the differentiated safety profile of UKONIQ, the first and only PI3k-delta and CK1-epsilon inhibitor, which is now commercially available to patients with relapsed or refractory marginal zone lymphoma and follicular lymphoma***. As we strive toward obtaining FDA approval of the investigational combination of UKONIQ and ublituximab, U2, in CLL by the PDUFA goal date of March 25, 2022, furthering our understanding of the safety and tolerability profile of UKONIQ remains paramount to us.

121. However, Defendant Weiss' statements touting the safety of UKONIQ based on prior clinical trial data were false and misleading in light of the massive increase in deaths and SAEs the Company had been reporting to the FDA over the past year. Moreover, Defendants' statements left investors with the impression that the purportedly good safety profile of the drug would contribute to the approval of U2 for CLL when in reality the FDA had already requested further information regarding overall survival in the UNITY-CLL trial, calling the drugs' approval into question.

122. While investors remained excited about the commercialization of UKONIQ and approval of U2 for CLL based on Defendants' statements, in reality, the likelihood of approval and continued sale of UKONIQ was only getting worse. While the Company was scrambling to pull together a response to the FDA's overall survival analysis, the number of deaths and SAEs continued to rise rendering any chance of demonstrating positive overall survival statistics impossible. Indeed, **in October, the Company reported nine additional SAEs, including five more deaths, four of which occurred over the course of one week.** And, **in November, TG reported to the FDA that UKONIQ caused thirteen more SAEs including two deaths**.

### I. The Severe Safety Issues Posed by UKONIQ and U2 Begins to Be Revealed as the FDA Elevates its Safety Review

123. The truth about UKONIQ's massive safety issues started to be revealed on November 30, 2021, when the Company issued a "Regulatory Update" press release announcing that the FDA notified the Company that it planned to host an ODAC meeting in connection with its review of the U2 BLA and sNDA for the treatment of CLL. The press release revealed that the "FDA's concern giving rise to the ODAC meeting appears to stem from an early analysis of overall survival from the UNITY-CLL trial" (*i.e.*, the analysis the Company just performed in response to the FDA's September inquiry). Moreover, the release explained that the FDA notified the

Company that potential questions and discussion topics at the ODAC meeting would include: the benefit-risk of the U2 combination in the treatment of CLL or SLL and the benefit-risk of UKONIQ for treatment of MZL and FL, the two indications for which UKONIQ had already been approved.

124. Notably, the release went on to reveal that the FDA had requested the overall survival analysis in September, and that the results demonstrated "[a]s of September 2021, the cut-off date for the overall survival analysis . . . there was an imbalance in favor of the control arm" that resulted in a hazard ratio of 1.23, or 1.04 when excluding deaths related to COVID-19. According to Sensabaugh, a hazard ratio over 1.00 is a significant red flag for a drug candidate, because it establishes that patients taking the drug have a higher death risk than patients in the control arm. A hazard ratio over 1.00 can preclude FDA approval of a drug or biologic or may cause a product to be removed from the market.

125. Employees understood that these concerns from the FDA would quickly turn to internal chaos at the Company. According to CW1, he recalled that beginning around Thanksgiving 2021, the monthly townhalls, attended by most senior leadership, became more frequent as Sportelli and Miskin provided updates on the FDA and ODAC meeting request to review the benefit-risk of UKONIQ, since it was an important topic at the Company. CW1 recalled that Sportelli had updated the Company around mid-December 2021 at a Company-wide townhall that "TG may decide to pull the BLA."

126. Finally, the release explained that while the date of the ODAC meeting had not been set, the FDA stated that it was targeting March or April of 2022 and thus, the Company did not think it was likely that the FDA would make a decision on the U2 BLA and sNDA by the PDUFA goal date of March 25, 2022.

127. Analysts were surprised by the announcement given the Company's positive statements about the safety of UKONIQ and U2 in the past. For example, on November 30, 2021, Jeffries published an analyst report entitled "Surprising ODAC Meeting Creates Uncertainty for CLL Approval" which explained "[t]he stock was down ~40%+ intraday as investors primarily concern 1) likelihood of getting CRL for U2 in CLL; 2) impact to FL/MZL current label and launch; 3) impact to upcoming ublituximab BLA in MS. The report also showed surprise given investors' understanding that Ukoniq had not resulted in unexpected AEs: "we will watch for more mature/detailed safety/OS data to make approvability assessment for CLL; 2) FL/MZL OS has not been reported and Ukoniq has not shown unexpected AE's, so the inclusion to ODAC discussion along with CLL is mostly for precaution." Likewise, JP Morgan issued an analyst report that same day stating, "the announcement of an ODAC panel for U2 in CLL (anticipated March/April timeframe), and the resulting likely push of the 3/22/21 PDUFA, arrives as a negative surprise."

128. In response to this news, **shares of TG Therapeutics plummeted $8.16 per share, or 34.93%, to close at $15.20 per share on November 30, 2021.**

129. Despite these disclosures, Defendants continued to mislead investors about UKONIQ's safety and path to approval. Specifically, despite knowing that UKONIQ was causing an alarming rate of SAEs and deaths (that continued to occur after the Company performed the FDA survival analysis), a November 30, 2021 press release quoted Defendant Weiss' reassurances to investors stating, "We appreciate the FDA's efforts in reviewing the U2 BLA/sNDA and its interest in obtaining the perspective of the ODAC regarding the benefit-risk of UKONIQ and the U2 combination. ***We believe UKONIQ is a unique PI3K inhibitor, with a differentiated toxicity and tolerability profile and believe the data submitted thus far are supportive of approval of U2***

***in CLL.***" For instance, CW1 recalled that the message at the meeting around mid-December 2021, where Sportelli had updated the Company that "TG may decide to pull the BLA," was extremely positive, while Sportelli also stated that it was not known for certain how things would end, that the Company may decide to pull the BLA, and that the Company would understand if employees started looking for new employment.

130. However, during a conference call held later that day, Defendant Weiss assured investors that the overall survival analysis was preliminary and that the Company was digging into the data: "So yes, we're now digging in hard to the data. Again, ***we looked at the data in context and thought it was an early OS and was not problematic. And then obviously, there was a difference of opinion on that***, it's why they want to get this at the ODAC."

131. Likewise, during the call, Defendant Weiss also downplayed the troubling hazard ratio data stating "just to be clear on that, I'm going to say that our -- ***the hazard ratio for overall survival for the frontline is already below 1. That's, I believe, independent of COVID as well. So it's a pretty solid HR at this point for OS for that frontline population.***"

132. Nevertheless, Defendants' reassuring statements above were false and misleading. Not only were Defendants aware of a significant increase in SAEs and deaths attributable to UKONIQ, but those AEs had continued through to October and November, even after finishing the overall survival analysis for the FDA in September– effectively confirming that no amount of digging into the data would improve the hazard ratio, which was only getting worse as more people died from using UKNOIQ. For example, a Jefferies analyst report published on November 30, 2021 stated "The current OS analysis was early (cut off as of Sept '21, ~20% expected events), and final OS data could change materially (Co plans to look at OS every 3-6M for updates.)"

133. Notably, buried at the bottom of the November 30, 2021 press release, the Company, for the first time, included purported warnings about the risks associated FDA's review of the safety of U2 and UKONIQ. Specifically, the press release included language purportedly warning investors that U2's approval *could be* in jeopardy and that the Company *could* have to withdraw approval of UKONIQ:

> [F]actors that ***could*** cause our actual results to differ materially are the following: **the risk that the FDA will not approve the BLA/sNDA submissions**; **the risk that FDA will withdraw approval of UKONIQ for the treatment of relapsed or refractory MZL or FL**; the risk that safety issues or trends observed in the UNITY-CLL study, including rates of serious adverse events and Grade 3 or greater adverse events. . . **the risk the Company will voluntarily withdraw the BLA/sNDA for ublituximab in combination with UKONIQ after further analysis of data from the UNITY-CLL study**; the **risk that the outcome of the ODAC meeting is not favorable** or, even if favorable, **the FDA does not approve the U2 combination or does so in a narrowly defined population or imposes certain restrictions or warnings that negatively impact the commercial potential of U2 in CLL**. . .

134. However, much like the Company's reassurances regarding U2 approval and UKONIQS continuing commercial viability, Defendants purported warnings regarding what *could* occur were effectively useless to investors because Defendants knew at that time that given the number of deaths that had occurred up until September and had continued to occur in October and November, such occurrences had already come to pass.

### J. Defendants Continue to Mislead the Market About UKONIQ and U2's Safety as Additional Information Is Revealed

135. On December 14, 2021, TG Therapeutics issued a press release touting the UNITY-CLL Phase 3 clinical trial data while again failing to disclose the increasing number of deaths and SAEs occurring in patients taking UKONIQ—including another two SAEs and one death in the month of December. Specifically, the press release quoted Defendant Weiss stating: "We are pleased to share two presentations last night at the American Society of Hematology ("ASH") annual meeting which included additional analyses of the UNITY-CLL Phase 3 trial evaluating

the U2 combination in patients with both treatment naïve and relapsed or refractory CLL. ***We believe these presentations showcase the versatility of the U2 combination both by treatment subgroup, and also interestingly in a patient population generally characterized as unsuitable for BTKi-based therapy***."

136. Then on January 27, 2022, Defendant Weiss participated in a webcast fireside chat during the B. Riley Securities 2022 Virtual Oncology Investor Conference. During the webcast, Defendant Weiss revealed for the first time that the FDA had imposed a partial clinical hold on the UNITY-CLL trial. The following day, in response to the unexpected news, TG Therapeutics issued a press release on SEC Form 8-K confirming the disclosure. Further, Defendant Weiss explained that the partial clinical hold was not based on any new information provided by the Company to the FDA but "appears to be based on the same data and concerns that gave rise to the previously announced [ODAC] meeting."

137. Investors and financial commenters were annoyed by the lack of transparency exhibited by Defendants. For example, a January 28, 2022 article published on Evaluate.com, entitled, "TG Slips Out a Nasty Surprise for Investors," stated:

> **Now there is even greater uncertainty given the company's dribbling out news of the clinical hold** on "select studies of U2 and its components", something Evercore ISI's Josh Schimmer said was presumably also due to concerns over overall survival. OS analysis, requested by the FDA last year, had revealed a 1.23 hazard ratio, or 1.04 when Covid-related deaths were excluded.
>
> **Obviously an HR over 1.00 implies that patients on U2 died more quickly than those on control,** at least numerically, with the caveat that this was an immature analysis that included a lot of data censoring. Coming on top of the apparent divergence between ORR and PFS, however, it does not add confidence to U2's chances of approval.

138. Then on February 3, 2022, the FDA issued a Drug Safety Communication announcing the agency was investigating a possible increased risk of death associated with

UKONIQ. The release stated that "[t]he FDA determined that initial findings from a clinical trial evaluating Ukoniq to treat a related type of cancer found a possible increased risk of death in patients taking the medicine." The release further explained that, "the FDA has also suspended enrollment of new patients in other ongoing clinical trials of Ukoniq while the FDA continues to review the UNITY findings"

**K. Defendants Continue to Downplay the Risks Posed by the Increase in SAEs and Deaths from UKONIQ and U2**

139. On March 1, 2022, TG Therapeutics hosted an earnings call with investors and analysts to discuss the Company's Q4 2021 results. During the conference call, Defendants continued to reassure investors about the safety of the drug and downplayed any concerns about the FDA's approval of U2. For example, during the call Defendant Weiss misleadingly stated:

> [W]e conducted the analysis and sent it to the FDA as requested. As has been reported previously, that analysis showed an imbalance in favor of the control arm, the hazard ratio was 1.23, but when excluding COVID, it was 1; a hazard ratio above 1.0 implies potential harm of a therapy, and below 1 a potential benefit. ***Given the shortcomings of the OS analysis, and similar results from other pivotal Phase III studies in CLL, we didn't see this OS imbalance as concerning.***
>
> * * *
>
> We spent the next two months trying to close the information gap. ***We were pleased to report about a month ago that we're able to reduce the missing survival information from 15% down to 5%. And we were further pleased to report at a high level that the capture of the additional survival data, the overall survival analysis, both in the ITT and the COVID-censored populations, the overall survival hazard ratio has improved from what we had seen in the original submission to the FDA. We provided that update to the FDA late last month.***

140. Likewise in response to a question from an analyst regarding the data included in the new overall survivability analysis, Defendant Power misleadingly avoided answering the question and again downplayed the HR and attributed the bad figures to the company missing 15% of the data when performing the initial analysis:

> Matthew Lee Kaplan – Ladenburg – Okay. And then just lastly on the new OS data that you submitted. You mentioned that there was kind of a positive improvement once you're able to decrease the number of patients that were missing data to 5% or less. Can you give us a little bit more detail in terms of the improvement in OS that you observed when you did that?
>
> Sean A. Power – So you would like the actual numbers, Matt?
>
> Matthew Lee Kaplan – Yes.
>
> Sean A. Power – I would love to share the numbers, but we made a decision that we did not want to do that until the FDA had full opportunity to review all of the information that we provided them. ***But what I can say, which I've said qualitatively, is that both the 1.23, which was the ITT, went down and the 1.04 for the COVID went down. So both those numbers are lower than they were.*** And again, we're seeking the truth, right? So at the time we presented the first analysis to them, we were missing 15% of the information… ***So, in actuality, had we had all the information at the time we submitted it, the numbers we had presented to the FDA would have been lower.***

141. Defendants' statements were false and misleading because they significantly downplayed the impact of the increasing SAEs and deaths would have on the FDA's assessment of the safety of UKONIQ, especially given the continued reporting of SAEs even after the FDA asked for an overall survival analysis as of September 2021.

### L. TG Therapeutics Unexpectedly Withdraws the U2 BLA and sNDA

142. On March 10, 2022, TG Therapeutics announced that the FDA set a date of April 22, 2022 for the previously announced meeting of the ODAC, in connection with its review of the BLA/sNDA for U2. However, on April 15, 2022, just seven days prior to the April 22, 2022 ODAC meeting, Defendants abruptly announced that they would be withdrawing the U2 BLA and sNDA and reiterated that they would be pulling sales of UKONIQ for treatment of MZL and FL. According to the press release, the decision to withdraw the BLA and sNDA **was based on recently updated overall survival (OS) data from the UNITY-CLL Phase 3 trial that showed an increasing imbalance in OS** and the Company's decision to withdraw UKONIQ from sale was "**primarily based on the withdrawal of the BLA and sNDA for U2 in CLL.**" The press

release quoted Defendant Weiss as stating "We were very disappointed to see that the recently updated overall survival data showed an increasing survival imbalance in favor of the control arm. Accordingly, we and our advisors determined that we should withdraw the BLA/sNDA for U2 in CLL."

143. Notably, the disclosure explained that the withdrawal was based on a new more up-to-date information request by the FDA for data beyond that which was submitted to the FDA in February 2022 with the September 2021 cut-off date. Specifically, the release stated that "[p]ursuant to a recent information request made by the FDA, updated OS data were collected that showed an increasing imbalance in favor of the control arm, differing from the improved results provided to the FDA in February 2022."

144. Defendants effectively had no choice but to disclose that the Company was withdrawing the U2 BLA and sNDA and pulling sale of UKNOIQ because the FDA would have informed the Company of the data and topics that were going to be discussed at the upcoming ODAC meeting. The FDA would have put together a "backgrounder," an informational packet containing the necessary data as well as the questions set up for the ODAC to review. Pursuant to FDA practice and procedure, this backgrounder is usually released to the public no later than two days prior to the meeting or day of the meeting but would have been sent to the company much earlier than that. Therefore, Defendants would have received the data that the FDA deemed alarming and subsequently known that such information would soon be disclosed to the public if they did not affirmatively withdraw the application.

145. The decision to withdraw the BLA and sNDA was a major decision taken by the Company because it costs a significant amount of money to withdraw a BLA since the process is very labor intensive and expensive. For example, the PDUFA fee for fiscal year 2021, which

includes the fee application with clinical data, was $2.8 million and for fiscal year 2020, the PDUFA fee was $2.9 million.

146. Analysts were stunned to hear of the voluntary withdrawal after years of touting progress, purported trial success, and high probability of approval. Specifically, an April 15, 2022 Evercore ISI analyst report titled, "The Hits Just Keep on Coming…Achtung Baby," which stated, "We've had a number of investors asking where TGTX would trade without its U/U heme franchise - and it looks like we'll find out soon enough….The company unexpectedly withdrew its BLA/sNDA for the combination of Ukoniq (PI3K inhibitor) and ublituximab (CD20 antibody) for CLL and cancelled the Advisory Committee meeting." The report continued with, "The U2 arm of the UNITY-CLL trial had shown an unfavorable survival imbalance…**But why not proceed with a panel, if there's nothing to lose**?"

147. On April 18, 2022, TG Therapeutics continued to disclose information related to the fallout of the serious health problems posed by UKONIQ. Specifically, the Company announced that it would be winding down its oncology program and halting all of the early-stage programs related to B-cell malignancies—*i.e.*, all of the oncology drugs in TG Therapeutics' pipeline.

148. In response to this news **TG Therapeutics' stock price fell $1.93 per share, or 21.81%, to close at $6.92 per share on April 18, 2022**.

### M. FDA Extended BLA PDUFA Date for its Multiple Sclerosis Drug Candidate, Ublituximab

149. After months of Defendants reassuring investors that the FDA's concerns with UKONIQ would have no effect on the PDUFA date for the Company's MS drug and application for Ublituximab, on May 31, 2022, the Company issued a press release entitled, "TG Therapeutics Announces FDA Extension of BLA PDUFA Date for Ublituximab to Treat Patients with RMS."

The press release explained that the FDA extended the PDUFA goal date to "allow time to review a submission provided by the Company in response to an FDA information request, which the FDA deemed a major amendment."

150. Analysts queried the extended PDUFA date, especially for the RMS drug. Specifically, a June 3, 2022 J.P. Morgan analyst report titled, "Ublituximab RMS PDUFA Extension – Routine or Real Reason for Pause?," stated that, "[t]he recently announced PDUFA extension of ublituximab in RMS obviously represents another blow to sentiment when it seemingly couldn't get worse…"

151. On this news, **TG Therapeutics' stock price fell $0.75 per share, or 14.51%, to close at $4.42 per share on May 31, 2022.**

**N. The Full Truth Emerges When the FDA Withdraws Approval of UKONIQ**

152. Finally, on June 1, 2022, the FDA published a drug safety communication entitled, "FDA approval of lymphoma medicine [UKONIQ] (umbralisib) is withdrawn due to safety concerns." The communication stated, in relevant part:

> Due to safety concerns, the U.S. Food and Drug Administration (FDA) has withdrawn its approval for the cancer medicine [UKONIQ] (umbralisib). [UKONIQ] was approved to treat two specific types of lymphoma: marginal zone lymphoma (MZL) and follicular lymphoma (FL).
>
> Updated findings from the UNITY-CLL clinical trial continued to show a possible increased risk of death in patients receiving [UKONIQ]. As a result, we determined the risks of treatment with [UKONIQ]outweigh its benefits. Based upon this determination, the drug's manufacturer, TG Therapeutics, announced it was voluntarily withdrawing [UKONIQ]from the market for the approved uses in MZL and FL.

153. On this news, **TG Therapeutics' stock price fell $0.51 per share, or 11.54%, to close at $3.91 per share on June 1, 2022.**

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

154. Plaintiffs allege that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or maintained the price of TG Therapeutics' publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

155. Throughout the Class Period, Defendants made a series of misrepresentations concerning the safety and commercial prospects of TG Therapeutics' two most important drugs, UKONIQ and U2. Specifically, Defendants made material misstatements and omissions that created a false impression that: (i) the increased number of adverse events and serious adverse events that impacted the safety profile of Umbralisib and U2 as it pertains to the drugs' overall benefit-risk ratio, overall survival data, and hazard ratio; (ii) it was unlikely that the Company would be able to obtain FDA approval of the U2 BLA or the U2 sNDA in their current forms; (iii) the Company had significantly overstated Umbralisib and U2's clinical and/or commercial prospects as compared to other PI3K inhibitors; and (iv) the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

156. To the extent any of Defendants' statements were opinions, they were false and misleading because they lacked a reasonable basis as Defendants knew that the clinical trial and commercial safety data indicated higher levels of AEs, SAEs, and deaths that contradicted the Company's statements about the safety of UKONIQ and U2 as well as the drugs' prospects for approval and commercialization.

157. In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.

158. Finally, to the extent that Defendants' statements are omissions of material facts, they had a duty to disclose such information because they chose to speak affirmatively on the topic of their drugs' safety profiles, clinical trials, and differentiation amongst other drugs in the PI3K drug class. Accordingly, Defendants had a duty to disclose any material negative information that, by not disclosing, rendered their affirmative statements false and misleading.

### A. February 5, 2021 – Press Release Announcing FDA Approval of UKONIQ

159. On February 5, 2021, TG Therapeutics published a press release announcing the FDA approval of UKONIQ. Specifically, Defendant Weiss stated:

> **Today's approval of UKONIQ marks a historic day for our Company with this being our first approval and we are extremely pleased to be able to bring our novel inhibitor of PI3K-delta and CK1-epsilon to patients with relapsed/refractory MZL and FL**. We have built a commercial team with significant experience who will immediately start to engage our customers to educate them on UKONIQ and how to access the product for patients in need and expect to make UKONIQ available to US distributors in the next few days.

160. The statements above that Defendants were "extremely pleased to bring [their] novel inhibitor of PI3K-delta…to patients" were materially false and misleading when made because, as discussed in sections E-H, *supra*, TG Therapeutics began experiencing and reporting to the FDA a sharp uptick in the frequency of SAEs in connection with UKONIQ and U2, including hospitalization, beginning no later than August 2020. Moreover, given the uptick in SAEs, Defendants' statements touting that the drugs were comparatively safer PI3K treatments, misled the market because the Company knew the recent uptick in SAEs contradicted that claim. In addition, Defendants statements touting the safety and success of UKONIQ created a misleading impression in investors' mind that that FDA approval for U2 was not in jeopardy when in reality

the sharp uptick in SAEs related to UKONIQ and U2 significantly increased the risk of the FDA not granting approval of U2 for treatment of CLL.

### B. February 8, 2021 – TG Therapeutics FDA Approval Conference Call

161. On February 8, 2021, TG Therapeutics held a conference call to discuss the FDA approval of UKONIQ and to answer questions regarding the toxicity tolerance of UKONIQ compared to other PI3K inhibitors, with Defendants Weiss and Waldman in attendance. Defendant Waldman explained:

> We have a dedicated medical team that is there to help community and academic physicians and nurses become comfortable and know what to expect from UKONIQ right out of the gates… ***A lot of the toxicities that we see in this area are things that they are very familiar with and can handle quite easily if they're made aware upfront.*** So we have a team ready to do that, and ***we make sure that we do a really good job of that***. And ***I think in previous launches around PI3K, that might not have been really well done***. ***I think we do have a differentiated product.***

162. In addition to the reasons set forth in paragraph 160, *supra*, Defendant Waldman's statements that UKONIQ was a "differentiated product" as compared to other PI3K inhibitors were false and misleading because, as described in Section A, *supra*, Defendants knew that their drug did not compare favorably to other drugs or treatments in the PI3K inhibitor drug class given the significant increase in the number and frequency of SAEs that were occurring in connection with patients taking UKONIQ and U2.

### C. March 2, 2021 – 4Q2020 Earnings Press Release

163. On March 2, 2021, TG Therapeutics issued a press release announcing the Company's 4Q and year end 2020 financial results. The press release quoted Defendant Weiss stating, in relevant part:

> 2020 was a year of data and regulatory execution for us as ***we delivered results from our UNITY-NHL study that led to the approval of UKONIQ in relapsed/refractory MZL and FL and from UNITY-CLL that will be used to support the current rolling BLA submission for ublituximab in combination with umbralisib for patients with CLL…***These successful outcomes were made possible

> by the hard work of everyone at TG over many years and has positioned us for an exciting 2021…***With the UKONIQ launch underway, we are excited to keep the momentum going and expect this year to complete our BLA submission for U2 in CLL***...

164. In addition to the reasons set forth in paragraphs 160 and 162, *supra*, the statements above were false and misleading because the Company gave investors the false impression that U2 approval was effectively assured, and TG Therapeutics would be able to leverage the positive data of the UNITY-NHL trial and FDA approval of UKONIQ for FL and MZL to then gain approval of U2 for treatment of CLL. In reality, Defendants knew that there was significant negative safety data being created in the form of rapidly accruing SAEs from patients taking UKONIQ and U2 that would significantly weaken the Company's chances of gaining FDA approval given the drugs' worsening safety profiles.

**D. March 2, 2021 – 4Q2021 Earnings Conference Call**

165. That same day, TG Therapeutics hosted an earnings conference call with investors and analysts to discuss the Company's 4Q 2020 results, with Defendants Weiss and Power present. During the earnings call, Defendant Weiss touted the success of the UNITY-CLL trial:

> ***For UNITY-CLL, we presented data demonstrating that U2 achieve the primary endpoint of improving progression-free survival over standard of care chemoimmunotherapy and those results were consistent for patients with treatment naïve CLL, as well as relapsed or refractory CLL***. In addition, there was a significant improvement in overall response rate, the secondary end point.

166. The above statements were false and misleading for the same reasons set forth in paragraphs 160, 162, and 164, *supra*.

**E. May 10, 2021 – 1Q2021 Earnings Conference Call**

167. On May 10, 2021, TG Therapeutics hosted an earnings conference call with investors and analysts, with Defendants Weiss and Power in attendance, to discuss the Company's 1Q 2021 results. Defendant Waldman continued to tout the safety and efficacy of UKONIQ:

> ***Through market research, advisory boards, and our field team engagements, we have confirmed that UKONIQ is a different -- is seen as a differentiated product. We've consistently heard that the proven efficacy across marginal zone and follicular, its unique MOA, tolerable safety profile low rates of discontinuation, and a lack of a black-box warning are important differentiators with health care providers and payers. We believe that these factors help establish UKONIQ in a class of its own***.

168. The above statements were false and misleading for the same reasons set forth in paragraphs 160, 162, and 164, *supra*.

**F. August 2, 2021 – 2Q2021 Earnings Press Release**

169. On August 2, 2021, TG Therapeutics issued a press release announcing the Company's 2Q 2021 financial results and providing a business update. In the press release, Defendant Weiss stated, in relevant part:

> ***We are pleased with the progress made throughout the second quarter, including our ongoing launch of UKONIQ in relapsed or refractory MZL and FL, FDA's acceptance of our BLA/sNDA for the combination of ublituximab and UKONIQ (U2) to treat CLL and SLL, and the continued advancement of our clinical programs***. We have built a strong commercialization infrastructure to launch UKONIQ and have received positive feedback from healthcare providers on their experiences with the product and with the TG team. We believe this solid commercialization foundation will support, if approved, the launch of U2 in CLL.

170. The above statements were false and misleading for the same reasons set forth in paragraphs 160, 162, and 164, *supra*.

**G. September 23, 2021 – Press Release Announcing Results from UKONIQ Safety Analysis**

171. On September 23, 2021, the Company issued a press release touting the safety of UKONIQ. The release quoted Defendant Weiss as stating:

> We are pleased that the integrated safety analysis of 371 patients treated with UKONIQ has been published in Blood Advances. ***We believe these data further support the differentiated safety profile of UKONIQ, the first and only PI3k-delta and CK1-epsilon inhibitor, which is now commercially available to patients with relapsed or refractory marginal zone lymphoma and follicular lymphoma***. As we strive toward obtaining FDA approval of the investigational combination of UKONIQ and ublituximab, U2, in CLL by the PDUFA goal date of March 25,

> 2022, furthering our understanding of the safety and tolerability profile of UKONIQ remains paramount to us.

172. In addition to reasons stated in paragraphs 160, 162, and 164, *supra*, the statements above were false and misleading because as of September 2021, TG Therapeutics had received a request from the FDA for an overall survival analysis, which the Company knew but failed to disclose, and given the significant uptick in SAEs and deaths caused by U2 and UKONIQ, such an analysis would produce a result that would severely jeopardize TG's chances of obtaining approval for U2.

## VI. THE TRUTH BEGINS TO EMERGE

### A. November 30, 2021 Disclosure – Press Release Announcing TG Therapeutics to Provide Regulatory Update

173. On November 30, 2021, TG Therapeutics were forced to partially disclose a press release informing investors that the FDA has notified the Company of its plan to host a meeting of the ODAC in connection with its review of the pending BLA/sNDA for U2. In response to this news, shares of TG Therapeutics plummeted $8.16 per share, or 34.93%, to close at $15.20 per share on November 30, 2021.

174. However, Defendants continued to reassure the market about the safety of U2 and UKONIQ and touted the likely FDA approval of U2 for treatment of CLL. Specifically, Defendant Weiss stated:

> We appreciate the FDA's efforts in reviewing the U2 BLA/sNDA and its interest in obtaining the perspective of the ODAC regarding the benefit-risk of UKONIQ and the U2 combination. ***We believe UKONIQ is a unique PI3K inhibitor, with a differentiated toxicity and tolerability profile and believe the data submitted thus far are supportive of approval of U2 in CLL.***

175. The statements above that Defendants "believe UKONIQ is a unique PI3K inhibitor, with a differentiated toxicity and tolerability profile" as well as "the data submitted thus

far" is "supportive of approval of U2 in CLL" were materially false and misleading when made for the reasons set forth in paragraphs 160, 162, 164, and 172, *supra*.

176. Notably, buried at the bottom of the November 30, 2021 press release, the Company, for the first time, included purported warnings about the risks posed by the ODAC meeting and the FDA's review of the safety of U2 and UKONIQ. Specifically, the press release included language supposedly warning investors that U2's approval could be in jeopardy and the FDA could withdraw approval of UKONIQ:

> In addition to the risk factors identified from time to time in our reports filed with the U.S. Securities and Exchange Commission, factors that ***could*** cause our actual results to differ materially are the following: **the risk that the FDA will not approve the BLA/sNDA submissions**; **the risk that FDA will withdraw approval of UKONIQ for the treatment of relapsed or refractory MZL or FL**; the risk that safety issues or trends observed in the UNITY-CLL study, including rates of serious adverse events and Grade 3 or greater adverse events. . . **the risk the Company will voluntarily withdraw the BLA/sNDA for ublituximab in combination with UKONIQ after further analysis of data from the UNITY-CLL study**; the **risk that the outcome of the ODAC meeting is not favorable** or, even if favorable, **the FDA does not approve the U2 combination or does so in a narrowly defined population or imposes certain restrictions or warnings that negatively impact the commercial potential of U2 in CLL**. . .

177. In addition to the reasons set forth in paragraphs 160, 162, 164, and 172, *supra*, the statements above were false and misleading because Defendants' purported tentative warnings about what "could" pose a risk to U2's BLA/sNDA approval as well as the withdrawal of approval for UKONIQ were already transpiring, which rendered the purported warning about the potential nature of such risks false and misleading.

**B. November 30, 2021 – TG Therapeutics Special Call**

178. On November 30, 2021, TG Therapeutics held a conference call, with Defendant Weiss in attendance, where Defendants continued to tout the superior safety and efficacy rates of TG Therapeutics' drug candidates and clinical trial results although the FDA revealed such results were misrepresented. Specifically, Defendant Weiss stated:

> [W]e're doing a lot of additional analysis. Again, this -- we kind of put together the overall survival data as a response to a request by the FDA**.** We did the best we could to gather that data. Again, it was not a primary focus of our efforts. It wasn't in the primary analysis. So again, we did our best to put it all together. We got it to them. And then there was some time between when we got it to them and then they -- saying, well, we're uncomfortable, right? So we want more information.
>
> So yes, we're now digging in hard to the data. Again, ***we looked at the data in context and thought it was an early OS and was not problematic. And then obviously, there was a difference of opinion on that****,* it's why they want to get this at the ODAC. So again, yes. So to answer your question, I don't have the answer today. We are digging in deep into this data to understand all of those facets of where we are with the overall survival and any of those factors that may be impacting it.
>
> ***
>
> [J]ust to be clear on that, I'm going to say that our -- ***the hazard ratio for overall survival for the frontline is already below 1****.* That's, I believe, **independent of COVID** as well. *So it's a* ***pretty solid HR at this point for OS for that frontline population****.*

179. In addition to reasons stated in paragraphs 160, 162, 164, and 172, *supra*, the statements above were false and misleading because Defendants knew, at that time, that the then-ongoing increase in severe SAEs and deaths from patients taking U2 and UKONIQ up to that point were contradictory to their assertions that the early OS "was not problematic" or that it was a "pretty solid HR at this point."

### C. December 14, 2021 – Press Release Announcing UNITY-CLL Phase 3 Clinical Results

180. On December 14, 2021, TG Therapeutics issued a press release touting the UNITY-CLL Phase 3 clinical trial data while again failing to disclose the increasing number of deaths and SAEs that were occurring in patients taking UKONIQ—including another two SAEs and one death in the month of December. Specifically, Defendant Weiss stated:

> We are pleased to share two presentations last night at the ASH annual meeting which included additional analyses of the UNITY-CLL Phase 3 trial evaluating the U2 combination in patients with both treatment naïve and relapsed or refractory CLL. ***We believe these presentations showcase the versatility of the U2***

> ***combination both by treatment subgroup, and also interestingly in a patient population generally characterized as unsuitable for BTKi-based therapy*.

181. The above statements were false and misleading for the same reasons set forth in paragraphs 160, 162, 164, 172, and 179, *supra*.

### D. January 10, 2022 – J.P. Morgan 40th Annual Healthcare Conference

182. On January 10, 2022, J.P. Morgan hosted the 40th Annual Healthcare Conference in which Defendant Weiss was in attendance and responded to questions regarding the ODAC meeting and alarming OS rates revealed by the FDA. Defendant Weiss stated:

> [O]verall survival analysis was done as part of an information request from the FDA during the review process. It is a prespecified secondary endpoint, but was not part of the primary analysis. And when we ran under the physical analysis, when we ran the first look at this data, we preset the primary endpoint, of course, which was always PFS. And then a series of secondary endpoints that we were going to test sequentially.
>
> Overall survival was not part of the primary analysis in secondaries that we originally done, mostly because it was not powered to be tested, and it was pretty early in terms of information available. Nevertheless, we did run that analysis for the FDA, the best that we could at the time. There was clearly missing information, but we gave them everything that we had. And as it turns out, there was an imbalance in favor of the control arm in overall survival.
>
> Important to note that if you remove or censor the COVID deaths, that imbalance is almost completely eliminated. So there's a lot to think about here. Again, our goal is 100% to make sure that we are putting a safe and effective treatment out there for patients. And I know that's what the FDA is targeting as well. Unfortunately, we don't have perfect information. The overall survival are going to be underpowered and at an early time point is subject to lots of variability and noise. So we're -- I think the FDA and TG are doing our best. The one thing I can say, again, because we are so concerned about this, I mean, we literally have gone patient-by-patient every death on the trial in the U2 arm, we've gone patient-by-patient to determine whether there's reason to believe that the drug contributed to the death. And when we come out to the other side, it just doesn't appear to be a problem. I mean we've looked at and I encourage everyone to take a look at the labels and publications around ibrutinib, acalabrutinib, venetoclax, every drug is associated with some level of treatment-related deaths. And we think that what we've seen so far with U2 is not out of the ordinary.

> So again, we're continuing to do our work. We continue to push through. We're looking forward to tell you more with the FDA about this and of course, sharing our findings with ODAC.
>
> ***
>
> So in terms of regulatory goals, look, we've got to get through a favorable ODAC to make the CLL application work of course. So we're focused on that. Our team is engaged fully in making sure that one, again, step one is we want to know the truth, we want to understand is there an issue here that we should be concerned about. We have no interest in putting anything forward that's not safe and effective for patients. ***Like I said, everything we've done thus far gives us a high level of confidence that the drug is not unduly unsafe. And so we're working toward that. So that hopefully would follow a favorable outcome, no doubt it would get us to a U2 approval.*** And then, again, probably the biggest of all the events of the year still is the approval of ublituximab and RMS and the target PDUFA date again, September 28.

183. The above statements were false and misleading for the same reasons set forth in paragraphs 160, 162, 164, 172, and 179, *supra*.

### E. March 1, 2022 – 4Q2021 Earnings Conference Call

184. Later that same day, TG Therapeutics hosted an earnings conference call with investors and analysts to discuss the Company's 4Q 2021 results. During the scripted portion of the call, Defendant Weiss stated, in relevant part:

> All right [N]ow, let's talk about our CLL BLA/sNDA and the upcoming ODAC. So I just want to remind everyone, first and foremost, that the UNITY CLL study, which was -- which is the primary study supporting the BLA/sNDA was conducted under special protocol assessment and met its primary endpoint of progression- free survival, and all key secondary endpoints. We submitted a BLA/sNDA for the U2 combination in the treatment of CLL and received a PDUFA goal date of March 25, 2022.
>
> In September of 2021, we received a request from the FDA to conduct an analysis of overall survival. While OS is stated as a secondary endpoint, there was no plan to analyze it prior to the end of the trial, which has not yet occurred. Importantly, the UNITY CLL study was not powered for overall survival which would have required dramatically more overall survival events. And in addition, a significant number of patients on the control arm crossed over to the U2 arm collectively making the OS results hard to interpret. Furthermore, since we were not planning an OS analysis until the end of the trial, not all the data was collected at the time

FDA requested the overall survival analysis, leaving about 15% of the patients with outdated or missing survival status.

Despite these material shortcomings, we conducted the analysis and sent it to the FDA as requested. As has been reported previously, that analysis showed an imbalance in favor of the control arm. [T]he hazard ratio was 1.23, but when excluding COVID, it was 1.04. A hazard ratio above 1 implies potential harm of a therapy, and below 1 a potential benefit. Given the shortcomings of the OS analysis and similar results from other pivotal Phase III studies in CLL, we didn't see this OS imbalance as concerning. Some of those examples included the original overall survival analysis from CLL14, which was the approval study for venetoclax plus obinutuzumab. Similar to our trial, the control arm was obinutuzumab chlorambucil, and at the time of approval, the hazard ratio was 1.24. No adjustment there because, of course, that study was conducted before COVID, so that would not have been a confounding factor.

We also took a look at the overall survival results from the ILLUMINATE study, which was used for approval of ibrutinib plus obinutuzumab. Again, similarly, the control arm was obinutuzumab chlorambucil, same as ours. The overall survival outcome in this study was even more peculiar. ***Here, the hazard ratio was 0.921, so below 1 at the time of approval, but in long-term follow-up turned negative against ibrutinib with a hazard ratio of 1.083. Both of these instances highlight the challenges of using underpowered overall survival analysis.*** So, I think everyone could imagine our surprise when in November of 2021 the FDA notified us that they plan to host a meeting of the Oncologic Drugs Advisory Committee, referred to as ODAC and ODAC being much easier to say, of course, in connection with its review of the BLA for ublituximab and the sNDA for umbralisib, stemming from the OS imbalance. It is also evident with the regulatory actions see, for other PI3K inhibitors that there is a concern with the overall class that is influencing the way the FDA is viewing this data.

We spent the next 2 months trying to close the information gap. ***We were pleased to report about a month ago that we're able to reduce the missing survival information from 15% down to 5%. And we were further pleased to report at a high level that the capture of the additional survival data, the overall survival analysis, both in the ITT and the COVID sensor populations, the overall survival hazard ratios improved from what we had seen in the original submission to the FDA. We provided that update to the FDA late last month.***

We also spent considerable amount of time doing a deep dive into the survival data, literally reviewing patient by patient to try to understand causality . . . the team has been hard at work preparing for the upcoming meeting and ***we are looking forward to the opportunity to showcase under critical review that UKONIQ is a unique PI3K inhibitor with a differentiated toxicity and tolerability profile.***

***

> I do think that given the opportunity to spend time with the ODAC panel and make them aware of the fundamental differences of this molecule versus the others and then share with them the safety data in as much detail as we have time to provide, plus the comparisons. I mean when you look at the comparisons to the approved agents, ***I can assure you that the U2 regimen in terms of SAEs, Grade 3 and treatment related deaths does not stand out, might be slightly higher on the Grade 3s and SAEs, but middle of the pack in treatment-related deaths.***

185. In addition to reasons stated in paragraphs 160, 162, 164, 172, and 179, *supra*, the statements above were false and misleading because Defendants knew that given the increased number of deaths that had occurred since the Company submitted its OS analysis to the FDA, the frequency of SAEs and deaths from UKONIQ and U2 had continued. Defendants' claims that the filling in of the "missing survival data" resulted in an improved hazard ratio were misleading because they failed to inform the market about the harmful data that had been accumulating since the OS analysis was performed and contradicted Defendants' claims of an improved HR.

186. During the call, Defendant Power had the following interaction with an analyst discussing the HR and OS rate:

> Matthew Lee Kaplan – Okay. And then just lastly on the new OS data that you submitted. You mentioned that there was kind of a positive improvement once you're able to decrease the number of patients that were missing data to 5% or less. Can you give us a little bit more detail in terms of the improvement in OS that you observed when you did that?
>
> Sean A. Power – So you would like the actual numbers, Matt?
>
> Matthew Lee Kaplan – Yes.
>
> Sean A. Power – I would love to share the numbers, but we made a decision that we did not want to do that until the FDA had full opportunity to review all of the information that we provided them. ***But what I can say, which I've said qualitatively, is that both the 1.23, which was the ITT, went down and the 1.04 for the COVID went down. So both those numbers are lower than they were.*** And again, we're seeking the truth, right? So at the time we presented the first analysis to them, we were missing 15% of the information… ***So, in actuality, had we had all the information at the time we submitted it, the numbers we had presented to the FDA would have been lower.***

187. The above statements were false and misleading for the same reasons set forth in paragraphs 160, 162, 164, 172, 179, and 185, *supra*.

**F. April 15, 2022 Disclosure – Press Release Announcing Voluntary Withdrawal of BLA/sNDA for U2**

188. On April 15, 2022, the Company issued a press release entitled, "TG Therapeutics Announces Voluntary Withdrawal of the BLA/sNDA for U2 to Treat Patients with CLL and SLL." The press release stated, in relevant part:

> TG Therapeutics [. . .] today announced that the Company has voluntarily withdrawn the pending Biologics License Application (BLA)/supplemental New Drug Application (sNDA) for the combination of ublituximab and UKONIQ® (umbralisib) (combination referred to as U2) for the treatment of adult patients with chronic lymphocytic leukemia (CLL) and small lymphocytic lymphoma (SLL). The decision to withdraw was based on recently updated overall survival (OS) data from the UNITY-CLL Phase 3 trial that showed an increasing imbalance in OS. Additional details are included below in the section entitled "ABOUT UNITY-CLL PHASE 3 TRIAL AND THE WITHDRAWAL OF THE BLA/sNDA SUBMISSION."
>
> In addition, the Company announced that it has voluntarily withdrawn UKONIQ from sale for the approved indications of adult patients with marginal zone lymphoma (MZL) who have received at least one prior anti-CD20-based regimen and for the treatment of adult patients with follicular lymphoma (FL) who have received at least three prior systemic therapies. UKONIQ was granted accelerated approval in these indications in February 2021. The Company's decision to withdraw UKONIQ from sale was primarily based on the withdrawal of the BLA and sNDA for U2 in CLL.

**G. April 18, 2022 Disclosure – TG Therapeutics Special Call**

189. On April 18, 2022, TG Therapeutics held a special call, with Defendants Weiss and Power in attendance, where Defendants explained that in addition to voluntarily withdrawing the BLA and sNDA, the Company would be winding down its oncology division. Specifically, Defendants revealed that the Company would be halting sales of UKONIQ in the market.

190. On this news, TG Therapeutics' stock price fell $1.93 per share, or 21.81%, to close at $6.92 per share on April 18, 2022.

191. However, Defendants continued to mislead the market with respect to the differentiated nature of U2 and UKONIQ as PI3K inhibitors. Specifically, Defendant Weiss stated:

> From the beginning, ***we at TG have recognized many of the liabilities of most PI3K-delta inhibitors. We have always believed and continue to believe that umbralisib is a different -- is differentiated from the others and we had been preparing tirelessly to make that case to the ODAC. However, successfully establishing a differentiated profile is difficult given the newly updated OS data and the growing concerns around the class.***

192. The above statements were false and misleading for the same reasons set forth in paragraphs 160, 162, 164, 172, and 179, *supra*.

### H. May 31, 2022 Disclosure – Press Release Announcing FDA Extension of Ublituximab PDUFA Date

193. Then, on May 31, 2022, Defendants issued a press release entitled, "TG Therapeutics Announces FDA Extension of BLA PDUFA Date for Ublituximab to Treat Patients with RMS." The press release explained that the FDA extended the PDUFA goal date to "allow time to review a submission provided by the Company in response to an FDA information request, which the FDA deemed a major amendment." The press release stated, in relevant part:

> TG Therapeutics [. . .] today announced that the U.S. Food and Drug Administration (FDA) has extended the Prescription Drug User Fee Act (PDUFA) goal date to December 28, 2022, for the Biologics License Application (BLA) for ublituximab as a treatment for patients with relapsing forms of multiple sclerosis (RMS).
>
> The FDA extended the PDUFA goal date to allow time to review a submission provided by the Company in response to an FDA information request, which the FDA deemed a major amendment. The submission comprised an integration and summary of certain clinical information that was previously provided to the FDA by the Company.

194. On this news, TG Therapeutics' stock price fell $0.75 per share, or 14.51%, to close at $4.42 per share on May 31, 2022.

### I. June 1, 2022 Disclosure – FDA Published Drug Safety Communication Withdrawing Approval of UKONIQ

195. Finally, on June 1, 2022, the FDA published a drug safety communication entitled, "FDA approval of lymphoma medicine [UKONIQ] (umbralisib) is withdrawn due to safety concerns." The communication stated, in relevant part:

> Due to safety concerns, the U.S. Food and Drug Administration (FDA) has withdrawn its approval for the cancer medicine [UKONIQ] (umbralisib). [UKONIQ] was approved to treat two specific types of lymphoma: marginal zone lymphoma (MZL) and follicular lymphoma (FL).
>
> Updated findings from the UNITY-CLL clinical trial continued to show a possible increased risk of death in patients receiving [UKONIQ]. As a result, we determined the risks of treatment with [UKONIQ]outweigh its benefits. Based upon this determination, the drug's manufacturer, TG Therapeutics, announced it was voluntarily withdrawing [UKONIQ]from the market for the approved uses in MZL and FL.

196. On this news, TG Therapeutics' stock price fell $0.51 per share, or 11.54%, to close at $3.91 per share on June 1, 2022.

## VI. LOSS CAUSATION/ECONOMIC LOSS

197. During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated and/or artificially maintained the price of TG Therapeutics securities and operated as a fraud or deceit on the Class Period purchasers of TG Therapeutics securities by making the materially false and misleading statements and omissions recited above.

198. When the truth was disclosed and became known to the market, the price of TG Therapeutics securities declined abruptly as the prior artificial inflation was removed from the price of the stock. As a result of their purchases of TG Therapeutics securities at artificially inflated prices during the Class Period, Plaintiffs and other members of the Class suffered a substantial economic loss (*i.e.*, damages under the federal securities laws). The price decline in TG Therapeutics securities was a direct result of the nature and extent of the materially false and

misleading statements and omissions revealed to investors and the market. Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and the Class.

199. The truth about TG Therapeutics' business was disclosed through a series of corrective disclosures and/or materializations of undisclosed risks beginning on November 30, 2021. During this period, TG Therapeutics' stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct affected TG Therapeutics' stock price. It was not until the final corrective disclosure and/or materialization of concealed risk on June 1, 2022 that the full truth was known to the market, such that there was no longer any artificial inflation in TG Therapeutics' stock price attributable to the fraud.

200. The declines in TG Therapeutics' stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

201. As a result of their purchases of TG Therapeutics securities during the Class Period, Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused TG Therapeutics securities to trade at artificially inflated levels throughout the Class Period.

202. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the safety data of U2. As the truth about the Company and the extent of the fraud was revealed to the market, the price of TG Therapeutics securities fell significantly. These declines removed the inflation from the price of TG Therapeutics securities,

causing real economic loss to investors who had purchased TG Therapeutics securities during the Class Period.

203. Each decline in the price of TG Therapeutics securities, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

204. The economic loss (*i.e.*, damages) suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of TG Therapeutics securities and the subsequent significant decline in the value of TG Therapeutics securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

205. The market for TG Therapeutics securities was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 1,867,473 shares during the Class Period. As a result of Defendants' misstatements and material omissions, as alleged herein, TG Therapeutics' securities traded at artificially inflated prices. Plaintiffs and other Class members purchased TG Therapeutics securities relying upon the integrity of the market relating to TG Therapeutics securities and suffered economic losses as a result thereof.

206. The declines in TG Therapeutics securities price on November 30, 2021, April 18, 2022, May 31, 2022, and June 1, 2022, were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors prior to the market opening on November 30, 2021, April 18, 2022, May 31, 2022, and June 1, 2022. The timing and magnitude of the declines in TG Therapeutics securities evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions or

macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

**A. November 30, 2021 – First Partial Corrective Disclosure/Materialization of the Risk**

207. On November 30, 2021, prior to the market opening, the relevant truth and foreseeable risks concealed by Defendants' misconduct and false representations and omissions during the Class Period were partially revealed and/or materialized in connection with TG Therapeutics' November 30, 2021 press release, which revealed for the first time that the FDA was calling an ODAC meeting to review alarming levels of OS rates, heightened deaths, and HR.

208. The November 30, 2021 disclosure, that the FDA planned to host an ODAC meeting to review the pending BLA/sNDA for U2 and answer questions regarding the benefit-risk analysis of U2 and the overall safety profile of the U2 regimen, including adverse events (serious and Grade 3-4), discontinuations due to adverse events, and dose modifications and the news related thereto was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' representation and omissions concerning the safety of its flagship drugs.

209. Moreover, the November 30, 2021 disclosure revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or was obscured by Defendants' prior misstatements and omissions regarding the Company's competitive advantage over its peers as a result of its superior safety data and analysis. This disclosure revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the safety of U2 and UKONIQ because it signaled to investors that the drug was not as safe as Defendants had portrayed, especially as compared to other drugs in the PI3K inhibitor drug class thereby increasing the likelihood the FDA would not approve the U2 BLA and sNDA.

210. As a direct and proximate result of this corrective disclosure and/or materialization of foreseeable risk concealed by Defendants' fraud, TG Therapeutics' stock price fell $8.16 per share, or 34.93%, to close at $15.20 per share on November 30, 2021.

211. However, despite this disclosure, which removed some of the artificial inflation in TG Therapeutics' stock price, its stock price remained artificially inflated after this announcement as Defendants knew but failed to disclose, or deliberately disregarded, that the safety and efficacy rates of the drug candidates were alarming and demonstrated severe AEs. Moreover, new information and/or foreseeable events related to the Company's misstatements had yet to occur.

212. Further, the Company's stock price remained artificially inflated even after the November 30, 2021 press release was published because, as set forth in paragraphs 178, 180, 182, 184, and 186, *supra*, Defendants falsely reassured investors regarding U2 and UKONIQ's safety, leading them to believe that the FDA approval was still assured.

213. Analysts attributed the drop in stock price to the revelation of the new information and/or materialization of undisclosed risks. For example, a November 30, 2021 analyst report published by Jeffries titled, "Surprising ODAC Meeting Creates Uncertainty for CLL Approval" stated that, "FDA's ODAC meeting request for U2 BLA/sNDA in all line CLL based on imbalanced early OS analysis is surprising…While we agree today's update creates uncertainty to all of above critical aspects, we see it is too early to make conclusion for negative outcomes - 1) we will watch for more mature/detailed safety/OS data to make approvability assessment for CLL; 2) FL/MZL OS has not been reported and Ukoniq has not shown unexpected AE's, so the inclusion to ODAC discussion along with CLL is mostly for precaution, unlikely resulting in material change to current label or launch." As a result, the Company's stock price continued to trade at artificially inflated prices.

### B. April 15-18, 2022 – Second Partial Corrective Disclosure/Materialization of the Risk[8]

214. On April 15, 2022, the relevant truth and foreseeable risks concealed by Defendants' misconduct and false representations and omissions during the Class Period were partially revealed and/or materialized when TG Therapeutics announced to investors that the Company voluntarily withdrew the BLA/sNDA for U2, just seven days before the ODAC meeting. Moreover, prior to the market opening on April 18, 2022, TG announced that it would be winding up its oncology division.

215. The April 15 and 18, 2022 disclosures, that TG Therapeutics voluntarily withdrew the BLA/sNDA for U2 and was winding up its oncology division as well as the Company voluntarily withdrawing UKONIQ from the market and the news related thereto was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' representations and omissions concerning the safety of U2.

216. Moreover, the April 15, 2022 disclosure revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or was obscured by Defendants' prior misstatements and omissions regarding the safety of the Company's drugs. This disclosure revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the safety of U2 and UKONIQ because it revealed to investors that the drug was not commercially viable and would not be approved in the near term due to safety issues with the drug and its unfavorable PI3K safety profile.

[8] The Nasdaq stock exchange was not open on April 15, 2022 in observance of Good Friday.

217. As a direct and proximate result of this corrective disclosure and/or materialization of foreseeable risk concealed by Defendants' fraud, TG Therapeutics' stock price fell $1.93 per share, or 21.81%, to close at $6.92 per share on April 18, 2022.

218. However, despite this disclosure of adverse news, which removed some of the artificial inflation in TG Therapeutics' share price, its share price remained artificially inflated after this announcement as Defendants knew but failed to disclose, or deliberately disregarded, that the true reason for the voluntary withdrawal of the BLA/sNDA was due to the Company's misrepresented safety data and death rates related to the Company's drug candidates that existed throughout the Class Period. Moreover, new information and/or foreseeable events related to the Company's misstatements had yet to occur.

219. Further, the Company's stock price remained artificially inflated even after the April 15, 2022 and April 18, 2022 disclosures because as set forth in paragraph 191, *supra*, Defendants falsely reassured investors that UKONIQ was still differentiated from other PI3K inhibitors, thereby giving investors the misleading impression that the drug was still viable as a commercial candidate.

220. Analysts attributed the drop in stock price to the revelation of the new information and/or materialization of undisclosed risks. For example, on April 18, 2022, Bloomberg First Word issued an article entitled "TG Therapeutics Tumbles After Pulling Cancer Drug, Application" and cited: "Jefferies analyst Chris Howerton (buy) writes they believe that oncology opportunities that include the umbralisib treatment 'now have little to no value.'" Likewise, Seeking Alpha, a financial news website, published an article entitled "TG Therapeutics stock falls 24% as it withdraws Ukoniq from sale, pulls filing with FDA," which noted that the stock price

fell "mainly based on the withdrawal of the BLA and sNDA for the drug combo referred as U2, in CLL."

### C. May 31, 2022 – Third Partial Corrective Disclosure/Materialization of the Risk

221. Then, on May 31, 2022, the relevant truth and foreseeable risks concealed by Defendants' misconduct, false representations, and omissions during the Class Period were partially revealed and/or materialized in connection with the May 31, 2022 press release, which notified the market that the FDA had extended the BLA PDUFA date for TG's MS drug candidate, Ublituximab.

222. The May 31, 2022 disclosure, that the FDA had extended the BLA PDUFA date for Ublituximab and news related thereto was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' representations and omissions concerning the safety of UKONIQ and U2.

223. Moreover, the May 31, 2022 disclosure revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or was obscured by Defendants' prior misstatements and omissions regarding the safety of the Company's drugs. This disclosure revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the safety of U2 and UKONIQ because it revealed that the Company's submission to the FDA, which was made in connection with the FDA's review of safety information for U2, was deemed a major amendment and contained new information that needed to be reviewed by the FDA.

224. As a direct and proximate result of this corrective disclosure and/or materialization of foreseeable risk concealed by Defendants' fraud, TG Therapeutics' stock price fell $0.75 per share, or 14.51%, to close at $4.42 per share on May 31, 2022.

225. However, despite this disclosure of adverse news, which removed some of the artificial inflation in TG Therapeutics' share price, its share price remained artificially inflated after this announcement as Defendants knew but failed to disclose, or deliberately disregarded, that the true reason for the voluntary withdrawal of the BLA/sNDA was due to the Company's misrepresented safety data and death rates related to the Company's drug candidates, which existed throughout the Class Period. Moreover, new information and/or foreseeable events related to the Company's misstatements had yet to occur.

226. Analysts attributed the drop in stock price to the revelation of the new information and/or materialization of undisclosed risks. Analysts were surprised to learn of the FDA extending TG Therapeutics' PDUFA date, considering Defendants' statements implied the PDUFA date would not be affected regardless of the ODAC meeting, revealed safety data, and voluntary withdrawal of the U2 BLA/sNDA. For example, J.P. Morgan filed an analyst report on June 3, 2022, discussing the FDA extending TG Therapeutics' PDUFA date, specifically "[t]he recently announced PDUFA extension of ublituximab in RMS obviously represents another blow to sentiment when it seemingly couldn't get worse . . ."

**D. June 1, 2022 – Final Corrective Disclosure/Materialization of the Risk**

227. Finally, on June 1, 2022, the relevant truth and foreseeable risks concealed by Defendants' false representations and omissions during the Class Period were fully revealed and/or materialized when the FDA published a drug safety communication revealing the withdrawal of UKONIQ due to safety concerns.

228. The June 1, 2022 removal of FDA approval for UKONIQ and the related news coverage identifying health and safety concerns related to the drug as the reason for the removal, was a foreseeable consequence of, and within the zone of risk concealed by, the Defendants' misrepresentations and omissions concerning the safety of the Company's drugs.

229. Moreover, the June 1, 2022 disclosure revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. The removal of FDA approval of UKONIQ revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the drug's purportedly superior safety.

230. As a direct and proximate result of this corrective disclosure and/or materializations of foreseeable risk concealed by Defendants' fraud, TG Therapeutics' stock price fell $0.51 per share, or 11.54%, to close at $3.91 per share on June 1, 2022.

231. Analysts attributed the drop in stock price to the revelation of the new information and/or materialization of undisclosed risks. News outlets reacted negatively to this update and attributed the bad news to the Company's misrepresented safety data. For example, Yahoo news reported on June 1, 2022 that the FDA "withdr[ew] its approval for TG Therapeutics Inc's lymphatic cancer treatment Ukoniq over concerns of higher risk of death in patients receiving the drug . . . **The U.S. health regulator has rarely withdrawn approval for treatments.**"

## VII. ADDITIONAL INDICIA OF SCIENTER

232. Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over TG Therapeutics' and the Individual Defendants' materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts:

### A. Ublituximab, Umbralisimab, and U2's Importance to the Company Supports a Strong Inference of Scienter Under the Core Operations Doctrine

233. As discussed above the Company and investors alike acknowledged that UKONIQ and U2 were TG Therapeutics' most important drug candidates in the Company's pipeline. In addition to being the Company's two most advanced drug candidates, UKONIQ and U2 represented TG's best opportunity to commercialize a drug and begin generating actual revenues from the sale of its drugs. Prior to the start of the Class Period TG had never obtained approval for any of its drugs and therefore had never generated any material sales revenues from its products. With UKONIQs approval at the start of the Class Period and U2's late-stage clinical trials and ongoing NDA and BLA submission underway, Defendants solely focused and relied on the successful commercialization and the FDA's approval of these therapies. Accordingly, the success of TG Therapeutics' business, reliant on the success of these therapies as a whole, was dependent on UKONIQ and U2's success.

234. Because these therapies constituted TG Therapeutics' entire business, the Individual Defendants were intimately aware of the results of the UNITY-CLL clinical trials, as well as the existence of any AEs, SAEs, and safety concerns surrounding its two flagship drug candidates. As discussed in Section F, *supra*, Defendants would of and did have access to internal databases that tracked adverse events.

235. Therefore, Defendants either knew, or were reckless in not knowing, that poor results or low survival rates in the UNITY-CLL trial would almost certainly result in the FDA refusing to accept the Company's expedited application as facially insufficient and ineffective. In fact, Defendants' close contact with the FDA throughout this process gives rise to the inference that Defendants knew of this issue given that overall safety was one of the FDA's key concerns.

## B. TG Therapeutics was Motivated to Conceal the Overall Survival Rate

236. Defendants were motivated to materially misrepresent to investors the true condition of the Company because their scheme and improper course of conduct: (1) deceived the investing public regarding TG Therapeutics' business, operations, and the intrinsic value of TG Therapeutics' securities; (2) enabled Defendants to artificially inflate the price of TG Therapeutics' securities; and (3) caused Plaintiffs as well as any other member of the Class to purchase TG Therapeutics' securities at artificially inflated prices.

237. Defendants were highly motivated to conceal from the market the significant risk that the FDA would reject TG Therapeutics' BLA and sNDA for U2 and withdraw its approval of UKONIQ for the market. Indeed, according to a proxy statement filed by TG Therapeutics on SEC Form DEF 14A on April 29, 2022, both Defendants Weiss and Power's compensation in 2021 was tied to the Company's regulatory achievements. Specifically, the proxy statement states: "[i]n 2021, Mr. Weiss was eligible to earn a target annual cash incentive equal to 100% of his base salary, and Mr. Power was eligible to earn a target annual cash incentive equal to 40% of his base salary . . ." The proxy further explained that "[b]oth executives' annual cash incentive awards were based upon the Company's performance against pre-established corporate goals and objectives (which at times may exceed 100%), which included a combination of clinical and regulatory goals related to our products." According to the proxy statement, those corporate goals included "Approval of MZL and FL by PDUFA date" "[f]iling of a BLA and sNDA for the combination of ublituximab and umbralisib for the treatment of CLL" and "[v]arious goals associated with the commercial launch for UKONIQ." Accordingly, Defendants were motivated to mislead the market and the FDA for the purposes of achieving those goals.

### C. Defendants Received Special Designations Allowing the Company to Work Closely with the FDA

238. TG Therapeutics and the Individual Defendants admitted to working closely with the FDA. In addition to maintaining close contact throughout the Class Period, TG Therapeutics engaged in a rolling submission process to the FDA which, in part, was meant to allow opportunity for accelerated FDA approval. Thus, TG Therapeutics and its senior executives were responsible for maintaining frequent and open communications with the FDA in order to expedite the approval process – a process critically important to the success of the approval and launch of UKONIQ and subsequently, U2.

239. According to TG Therapeutics' press releases, TG Therapeutics' executives, including Defendant Weiss, expressed excitement over the opportunity to work closely with the FDA on the development plan of the drug. TG Therapeutics further received the FDA's Fast Track Designation – a program designed to allow the FDA to pay even closer attention to development design and research plan for U2 here, intended to fill an unmet medical need.

240. TG Therapeutics' commitment to working closely with the FDA paired with the FDA's Fast Track Designation of UKONIQ and U2 raises the inference that the Individual Defendants and other TG Therapeutics' executives were in close communication with the FDA because this designation allows for more frequent meetings with the FDA to discuss drug testing, research, and development, more frequent responses, and rolling FDA review. As part of the preparation and attendance for these meetings, attendees would know, or were reckless in not knowing, the details of the drug development plan which would include OS rates and the accurate HR.

241. TG Therapeutics further applied for and received two additional FDA designations along with FDA Fast Track Designation. These designations, the orphan drug and breakthrough

therapy designations, further required additional FDA oversight in exchange for expedited treatment of review. In preparing the applications for these unique designations, TG Therapeutics' executives knew, or were reckless in not knowing, the OS rates associated with their testing as well as the HR. Because these special designations warranted increased FDA oversight and expedited FDA review, TG Therapeutics and the Individual Defendants knew, or at least should have known of the material adverse events negatively impacting the research results of the UNITY trials.

**D. Defendants' Statements Support a Strong Inference of Scienter**

242. Throughout the Class Period, Defendants spoke at length about: (1) the Company's close and continuous contact with the FDA; (2) the Company's rolling review process with the FDA warranting expedited review of the Ublituximab, Umbralisimab, and U2 development; and (3) the FDA's concerns about the Ublituximab, Umbralisimab, and U2's survival rates. For each of these topics of discussion, Defendants were in possession of non-public information that was not disclosed to the investing public. Defendants' scienter is therefore evidenced by their detailed statements on these topics during the Class Period. Defendants breached their duty under the federal securities laws by speaking on these topics and failing to fully disclose all relevant material information while doing so.

243. Defendants spoke at length regarding their communications with the FDA about the clinical trial design. Defendants were therefore in possession of material non-public information related to their discussions with the FDA, especially as it pertains to any additional efficacy requirements that were known to the Company, including overall survival rates.

244. Defendants were also privy to material non-public information contained in the FDA's information request sent to the Company. This information request followed the FDA's meeting with ODAC regarding TG Therapeutics' pending applications. In a November 30, 2021

press release, TG Therapeutics affirmatively stated that the "overall safety profile of the U2 regimen, including adverse events."

245. Accordingly, Defendants must have known or were reckless in not knowing that poor survival results occurring in the UNITY-CLL trial would almost certainly result in rejection of the FDA application as overall safety and survival were key FDA concerns.

## VIII. CLASS ACTION ALLEGATIONS

246. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all persons and entities that purchased or otherwise acquired the publicly traded securities of TG Therapeutics during the period from February 5, 2021 through May 31, 2022, both dates inclusive. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of TG Therapeutics during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) TG Therapeutics' employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

247. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TG Therapeutics' shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of TG Therapeutics shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by TG Therapeutics or its transfer agent

and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

248. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

249. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

250. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of TG Therapeutics;

(c) Whether, and to what extent, the market price of TG Therapeutics common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d) Whether Defendants acted with the requisite level of scienter;

(e) Whether Defendants Weiss and Power were controlling persons of TG Therapeutics; and

(f) Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

251. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

252. To the extent that Plaintiffs allege that Defendants made affirmative misstatements, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e) Plaintiffs and other members of the Class purchased TG Therapeutics securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

(f) TG Therapeutics stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g) According to the Company's Form 10-K filed on March 1, 2022. the Company had approximately 142,817,329 shares outstanding as of February 23, 2022, demonstrating a very active and broad market for TG Therapeutics securities;

(h) TG Therapeutics filed periodic public reports with the SEC;

(i) TG Therapeutics regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, the Internet, and other wide-ranging public disclosures;

(j) TG Therapeutics was followed by several securities analysts employed by major brokerage firms including J.P. Morgan, Jefferies, Evercore ISI, and H.C. Wainwright & Co., which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms, were publicly available, and entered the public marketplace;

(k) Unexpected material news about TG Therapeutics was rapidly reflected in and incorporated into the Company's stock price during the Class Period; and

(l) There were market makers for TG Therapeutics' shares during the Class Period.

253. As a result of the foregoing, the market for TG Therapeutics securities promptly digested current information regarding TG Therapeutics from publicly available sources and reflected such information in TG Therapeutics' share price. Under these circumstances, all persons and entities who purchased or otherwise acquired TG Therapeutics securities during the Class Period suffered similar injury through their purchase of TG Therapeutics at artificially inflated prices and the presumption of reliance applies.

254. To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to TG Therapeutics and the safety of its drugs, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X. INAPPLICABILITY OF STATUTORY SAFE HARBOR

255. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

256. To the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

257. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of TG Therapeutics who knew that the statement was false when made.

## XI. CONTROL PERSON ALLEGATIONS

258. The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements

contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

259. The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to TG Therapeutics during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

260. The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about TG Therapeutics' business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings thereof, and reports and other information provided to them in connection therewith.

261. As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to TG Therapeutics' operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of TG Therapeutics securities would be based upon

truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

262. The Individual Defendants are liable as primary participants in a wrongful scheme and course of business that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired TG Therapeutics securities during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omissions) regarding TG Therapeutics' continued positive statements about the safety and efficacy of the Company's drugs despite knowing the severe safety concerns posed to patients.

263. The scheme: (i) deceived the investing public regarding TG Therapeutics' operations and the true value of TG Therapeutics' securities, and (ii) caused Plaintiffs and other members of the Class to purchase or otherwise acquire TG Therapeutics securities at artificially inflated prices.

264. In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of TG Therapeutics, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## XII. CAUSES OF ACTION

### COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 against Defendants TG Therapeutics, Weiss, Power, and Waldman

265. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

266. During the Class Period, Defendants carried out a plan that was intended to, and did: (a) deceive the investing public, including Plaintiffs and the Class; and (b) artificially manipulate the price of TG Therapeutics securities.

267. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of conduct that operated as a fraud and deceit upon purchasers of TG Therapeutics securities in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

268. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

269. Defendants' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of TG Therapeutics securities and were aware of the dissemination of information to the investing public that they knew or recklessly disregarded to be materially false and misleading.

270. Defendants had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged herein, or acted with reckless disregard for the truth. Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public, and to artificially manipulate the market price of TG Therapeutics securities.

271. By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

272. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and members of the Class suffered damages in connection with their respective purchases and sales of TG Therapeutics securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act against the Individual Defendants

273. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

274. The Individual Defendants had control over TG Therapeutics and made the materially false and misleading statements and omissions on behalf of TG Therapeutics within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

275. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. TG Therapeutics, in turn, controlled the Individual Defendants and all of its employees.

276. By reason of such wrongful conduct, Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Determining that this action is a proper class action, designating Lead Plaintiff as Lead Plaintiff and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## XIV. JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS

Plaintiffs demand a trial by jury.

Dated: October 28, 2022

**LABATON SUCHAROW LLP**

By: /s/ *Michael P. Canty*
Michael P. Canty
James T. Christie
Michelle V. Cooper
140 Broadway
New York, New York 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477
Email: mcanty@labaton.com
jchristie@labaton.com
mcooper@labaton.com

*Lead Counsel for Lead Plaintiff Boston Retirement System and Additional Plaintiff Building Trades Pension Fund of Western Pennsylvania and the Proposed Class*