MCKHShaO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

EUGENE SHAPIRO, individually
and on behalf of all others
similarly situated,

                    Plaintiff,

          v.                              22 Civ. 6106 (JSR)

TG THERAPEUTICS, INC., et al.,

                                          Oral Argument

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          December 21, 2022
                                          4:35 p.m.

Before:

                    HON. JED S. RAKOFF,

                                          District Judge

                         APPEARANCES

LABATON & SUCHAROW LLP
     Attorneys for Plaintiff
BY:  JAMES THOMAS CHRISTIE
     MICHAEL P. CANTY

ROPES & GRAY, LLP
     Attorney for Defendants
BY:  ADAM HARRIS
     GREGG L. WEINER

MCKHShaO

(Case called)

MR. CHRISTIE:  Good afternoon, your Honor.  James Christie from Labaton & Sucharow on behalf of the plaintiffs, and with me is Michael Canty of Labaton & Sucharow.

MR. CANTY:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. WEINER:  Good afternoon, your Honor.  Greg Weiner from Ropes & Gray on behalf of the defendants, and my colleague, Adam Harris, is with me as well.

THE COURT:  Good afternoon.

All right.  We're here on the motion to dismiss.  Let me hear first from moving counsel.

MR. WEINER:  Thank you, your Honor.

THE COURT:  I see you have to draw the -- how tall are you?

MR. WEINER:  Well, I used to be 6'2".  I'm about 6'1" now.  Age has impacted me.

THE COURT:  Didn't you see my individual rules that no one who's more than 5'6" is permitted in my court?

MR. WEINER:  I must have missed that one, but only so much I can do about that.

THE COURT:  Indeed.  Go ahead.

MR. WEINER:  Thank you.

So we represent TG Therapeutics.  It's a New York-based biopharmaceutical company that develops

treatments for serious and deadly diseases, including leukemia.

Now, there are numerous deficiencies in the amended complaint, and most fundamentally the case hinges on the claim that the company made false and misleading statements because it failed to timely disclose to investors a request by the FDA for interim, incomplete, and statistically insignificant data regarding a drug candidate called U2 and to apprise investors of SAEs, or significant adverse events, in a recently approved drug, UKONIQ, which were timely reported to the FDA and were publicly available.

There were no false and misleading statements, as I'll explain, and there was no obligation to make either of these disclosures.

THE COURT:  So because I've read both parties' papers, let me just ask you, skipping ahead to something you probably won't be coming to until later in your presentation, is it your contention that the individual defendants were not aware of the adverse events that were observed during the clinical trials?

MR. WEINER:  Well, to be clear, there are two -- I want to be clear about the distinction between UKONIQ, which was approved by the FDA in February 2021, and then there were ongoing clinical trials for U2, which was the combination of UKONIQ and ublituximab, which was another drug.

THE COURT:  If you haven't already, you better spell that at some point for the reporter.  Go ahead.

MCKHShaO

MR. WEINER:  So the SAEs that are alleged in the complaint are related to UKONIQ.  There's also allegations relating to overall survival and deaths in patients in the U2 trial.  So we could distinguish between the two, but in terms of the SAEs involving UKONIQ, that is not something the officers were tracking on a kind of monthly basis or not, but we're not going to contest -- I think, in fairness, we're not -- we don't have to contest that in our view.  We're prepared to sort of concede for purposes of the motion that the senior officers would be aware of generally SAEs that were being reported to the FDA.

THE COURT:  And also along the same lines, I think you do contend that they lacked scienter, but if you're conceding for these limited purposes that they knew about those events, and if I understand the allegations that they were entitled to a bonus tied to FDA approval, why isn't the combination of that enough to establish scienter even to the higher standard of the PSLRA?

MR. WEINER:  Sure.  So two of the three named officers are alleged to have a bonus opportunity, if you will.  And as to those two, it's not that there was a -- the bonus was tied to approval of this U2 drug.  It's that the bonus was tied to approval of UKONIQ, which had already happened in February of '21, before the alleged SAEs were kicking in; second, the filing of what's called a BLA, a Biologics License Application,

with the FDA, which also had already taken place in early '21, I think March specifically; and then, last, it's tied allegedly to -- the bonus compensation was tied to commercialization goals around UKONIQ, the approved product.

As to that, I think the cases are clear that that type of compensation is not sufficient to create a strong inference of scienter because it's a very generic thing.  But, here, it's particularly weak because, again, there's no connection -- there's no attempt to quantify the economic benefit that could be provided to an individual, one of those two officers, around the commercialization of UKONIQ.  They don't allege what the goals were.  They don't tie alleged misstatements about UKONIQ to commercialization and therefore bonuses, and they certainly don't provide any allegation about the quantum, about what that benefit would be and how much it would be and why it would be potentially material to any individual officer.

And, of course, the other flaw in their allegation is that when it comes to the U2 drug, which was the one under clinical trial, there was nothing -- to the extent there was any connection, any bonus tied to approval of that drug, misstating -- not reporting SAEs to investors would not impact the FDA's approval of the drug because the SAEs were reported directly to the FDA, and there's no allegation they weren't. So there's no connection between those two things.

THE COURT:  All right.  So I cut you off, but why

MCKHShaO

don't you come back --

MR. WEINER:  I obviously appreciate any and all questions, your Honor.

So I think there are sort of two basic type of statements that are challenged, and the first are statements that we believe are opinion statements focused on UKONIQ and along the lines of UKONIQ having a differentiated safety profile from competitor drugs which are known as PI3K inhibitors, and that's going to be crucial as we'll explain. Those are known to be --

THE COURT:  If I understand what they've set forth, I think it's in paragraph 111, the statement which was made during an earnings call by Mr. Waldman, "Through market research, advisory boards, and our field team engagements, we have confirmed that UKONIQ is a different -- is seen as a differentiated product.  We've consistently heard that the proven efficacy across marginal zone and follicular, its unique MOA, tolerable safety profile, low rates of discontinuation, and a lack of black-box warning are important differentiators with health care providers and payers.  We believe that these factors help establish UKONIQ in a class of its own."

Why isn't the only statement of opinion there the last sentence?

MR. WEINER:  Well, I think in that particular statement, certainly the last statement is a statement of

MCKHShaO

opinion.  I think it is linked to the prior sentence, and when it talks about UKONIQ is seen as a differentiated product, I think that can be viewed as an opinion.  But regardless of whether it's an opinion or not, your Honor, the references here are --

THE COURT:  Well, let me just make sure I understand. The middle sentence says, "We've consistently heard that the proven efficacy across marginal zone and follicular, its unique MOA, tolerable safety product profile, low rates of discontinuation, and lack of black-box warning are important differentiators with health care providers and payers."

Isn't that a statement of fact that there is a proven efficacy, a unique MOA, tolerable safety profile, etc.?

MR. WEINER:  Yes, I think it's fair to say that that could be considered a statement of fact rather than a pure statement of opinion.  I'm OK with that.  But the crucial thing there is there's no challenge to the accuracy of the assertion that they've heard from advisory boards and field team engagements, and the like, that there is a proven efficacy. They don't challenge efficacy in any way, shape, or form. That --

THE COURT:  Well, the word "proven," it's unclear how much it modifies the rest of the sentence, but what about "tolerable safety profile"?

MR. WEINER:  Yeah, and I think that that's connected

MCKHShaO

to the unique MOA, which is the method of application, right? The tolerable safety profile, that is, I believe, clearly a reference to, and if you take it in context, the lack of a black-box warning, for example, comparative to the other PI3K drugs. So, again, I think it could be viewed as an opinion in the overall context, including that's all a setup to the "we believe" statement. But even if it's not considered a pure opinion, there's nothing about it that's alleged to be false or untrue in any way, and the whole basis of this statement and all of these statements is the comparison.

I think for this statement, your Honor, it's also important to note this is being made --

THE COURT: I want to hear from your adversary on what they're alleging, if anything, is false in that statement, but I'm not sure I understand the argument you're making now.

If I say that in a release, hypothetical release, our product, because it has been proven to cure cancer, is therefore different from other products on the market, the last part of that sentence is arguably a statement of opinion, but the part of the sentence that says "our product, because of its proven ability to cure cancer" is a statement of fact.

MR. WEINER: Well, again, proven efficacy is not challenged.

THE COURT: Well, I'm hearing you.

MR. WEINER: That's right. Tolerable safety profile,

right, doesn't say safe, doesn't say -- it says "tolerable safety profile," so that is a sort of more imprecise statement, if you will, about safety characteristics.  And I think, in context, it's very much a comparative to the drugs.  And all the prior statements and subsequent statements, I think, are quite clear that what's being talked about there is a comparative to these very -- this class of drugs, PI3K inhibitors, which are known to be dangerous drugs.

THE COURT:  All right.

MR. WEINER:  So what I was also going to say there, your Honor, in terms of that statement, I think it's important the statement is made on May 15, 2021, which I think if you look at the allegations around SAEs and certainly any communication from the FDA, those are after this statement.  So there's no basis to say that this statement was false and misleading at the time it was made.

THE COURT:  I may give you another three minutes before I interrupt again.

MR. WEINER:  As I said, I welcome it.

So just also I think an important point about this drug UKONIQ which was approved by the FDA, it's approved for the treatment of relapse and refractory forms of leukemia.  MZL is one and FL are the other.  And as we talk about these SAEs, this is a sick, very sick population that is getting this drug in a relapsed condition, having taken other medications which

MCKHShaO

didn't succeed. So all of that, I think, contextualizes the SAEs that are alleged later. So that's just a preliminary thing.

And then, second, in terms of the other statements, there's sort of challenges to statements that I would say are in the nature of corporate optimism about the prospects for FDA approval of the U2 drug. And while there are some statements in that vein, I think they're largely forward-looking in nature. And crucially, the way plaintiffs characterize them is just not true. They say on page 17 of their opposition brief that TG "effectively assured" investors that FDA approval was guaranteed, and it's just not what the record reflects, what the allegations and the actual statements are.

So in terms of just a couple of other, I think, somewhat overarching points, I think timing is important here. And as I said, UKONIQ was approved in February '21, and the uptick, the alleged uptick, in SAEs and the communications with the FDA come much later in 2021, and so that's crucial.

Then on November 30, 2021, there is a disclosure, quite detailed disclosure, of the fact that the FDA had made an inquiry regarding the U2 trial, that there was a preliminary analysis around overall survival in that trial, and that the FDA had determined to hold an ODAC meeting, which is the oncological drug advisory committee, and that was a serious event. It was disclosed. The market reacted negatively to it,

but the company disclosed it.  There's no allegation it didn't timely disclose it, and the company went on to very clearly talk about the risks that were associated with that development.  And the opposition, in fact, says -- and this is their words -- "the defendant's fraud came crashing down on November 30, 2021," and yet they've got a class period that runs till June of 2022.  I submit there's no basis for any claim about misleading statements post-November 2021.  So, again, that's important.

Another overarching point, I call it conflation, but, essentially, they commingle alleged information and data involving UKONIQ with information and data related to the ongoing U2 clinical trial.  They can't do that.  These are distinct drugs.  UKONIQ is part of U2, so that's fine.  But, for example, when they focus on the overall survival data that the FDA was looking at in the U2 trial, they make -- the complaint asserts that somehow that is relevant to statements about UKONIQ's safety profile, and they're not.  The statements about differentiated safety profile, all of the statements about differentiated safety profile relate to UKONIQ.  They don't specify the U2 combination.  That's an important distinction.

Then, last, in terms of overarching issues, there's a focus here on -- by the plaintiffs on just raw data, and then they leap to conclusions from that data, and that's not

MCKHShaO

permissible.  So, for example, they focus on these SAEs that they say were occurring in 2021 in UKONIQ, but they don't plead anything about the significance of those in terms of how many patients were on UKONIQ, how many SAEs were there in the competitor drugs, how many patients were on those competitor drugs, and all of that would be crucial to establishing their assertion that these SAEs were alarming and troubling and created great risk to the company and the ongoing approval of that drug by the FDA.

THE COURT:  All right.  Thank you very much.  Let me hear from plaintiff's counsel.

MR. CHRISTIE:  Thank you, your Honor.  James Christie from Labaton & Sucharow.  Six feet tall.  We won't get into weight.

So, your Honor, I would just like to start by responding to some of the arguments the defendants --

THE COURT:  You look to me like about 16, so you're still a growing boy.

MR. WEINER:  I wish, your Honor.

Number one, my adversary here has made some arguments about whether or not the allegations here are related to U2 or UKONIQ, and he kind of just glazed over an important point here, and that is that anyone who is on the drug U2 was also on the drug UKONIQ.  And to be sure about that, there are some allegations in the complaint about the fact that the ODAC

MCKHShaO

meeting was going to include some evaluation of UKONIQ as well alone, because it had already been approved.  And we also know, your Honor, that the FDA eventually rescinds approval of UKONIQ at the end of the class period, and that's because of the concerns that are surrounding that drug.  So any characterization that U2 and UKONIQ are kind of different and that the FDA would have a different concern over them or that investors would have a different concern, I think that's kind of lost.  And it's in the complaint here, but that's not the case.

THE COURT:  Let me skip again to a different point. Didn't they disclose to the FDA and to the FDA database all the adverse events?

MR. CHRISTIE:  Yes, your Honor, they have to report the adverse events to the FDA.

THE COURT:  Right.  And that was publicly available.

MR. CHRISTIE:  Your Honor, we take some issue with the publicly available argument here.

THE COURT:  All right.

MR. CHRISTIE:  And the reason for that is this isn't simply publicly available information if you went on Google and said I want to see the number of SAEs that existed during the class period.  That's not how it works.  You have to go on the website.  You have to -- you have to have familiarity with what's called a relational database.  The defendants have been

MCKHShaO

able to provide a *post hoc* analysis which they provided as an exhibit to their motion to dismiss, your Honor, but that being said, there is absolutely no evidence whatsoever that investors were actually aware of any of these SAEs.  And, your Honor --

THE COURT:  Well, maybe -- now this may go beyond what's appropriate for a motion to dismiss, but I would have thought that stock market analysts in this area would have known how to get onto the FDA database and then, therefore, would have publicized anything they thought was material, and yet there doesn't seem to have been any market reaction until the big drop later.

MR. CHRISTIE:  Yes, your Honor.  And you've made my point for me, and I appreciate that.  The analysts don't mention that they know about the SAEs.  They say the opposite. They say we're surprised to hear that there's all these issues with safety and data with these drugs, because all we've heard is the complete opposite from the defendants.  And there's no indication that they know about these SAEs, that they're tracking them.  It's really quite the opposite, your Honor, and I think that's reflected in their surprise and in the stock reaction that occurs.

To your point, your Honor, what this is, essentially, is a truth-on-the-market defense, and the law is clear that that's typically reserved for not the motion to dismiss stage because it's, obviously, a highly factually intensive inquiry.

MCKHShaO

THE COURT:  Now, shifting gears for a minute to the other point I was asking your adversary about, or as you would say, your brother at the bar --

MR. CHRISTIE:  Older brother, right?

MR. WEINER:  That's not fair.

MR. CHRISTIE:  He's young at heart, right.

THE COURT:  Those statements like the one I quoted, isn't it the gist of those statements that these drugs, or at least UKONIQ, is in a class of its own?  And that statement surely by itself is a statement of opinion.  I reject it, of course, because I know from my wife that only my children are in a class of their own.

But in all seriousness, while certain statements there might, if viewed in isolation, be viewed as statements of fact, the overall gist which would, they claim, have been apparent to any listener or any reader is that he's just making the case for his opinion that this drug is in a class by itself.

MR. CHRISTIE:  So, yes, your Honor, here's what I would say, and this is our position in our brief and we make this point.  Number one, these are omissions.  These statements about the company's differentiated safety profile and the tolerable safety profile and the fact that UKONIQ was a differentiated product, we allege that these are half-truths because the defendants are in possession -- as Mr. Weiner here has admitted, that the defendants seem to have known about

MCKHShaO

that; they were tracking them.  When they say that it has a differentiated safety profile, that means one thing to investors, your Honor, and that means that the drug is safe; that it's actually safe.  And we posit here in our complaint that given the uptick in SAEs that occurred, certainly by the summer of 2021 where you have over ten people having died just in the year of 2021 and 50 SAEs occurring, that by that time you certainly have an area of information that the defendants are aware of that really contradicts what they say in their statements.

And, your Honor, in our argument here we say that many of them aren't opinion statements because, again, as you pointed out, they only say "we believe" at the end, and we think there's a lot of factual statements that come before that that are false and misleading because of the number of SAEs that had been occurring that the defendants knew about.

But the other point I just want to make --

THE COURT:  Let's go back to the specifics.  This is only one and there are others in your complaint, but tell me which of the statements -- this is on paragraph 111 of your complaint -- which of the statements you say you have asserted were false.  I'll read it again, and you stop me when I read the one that you say you've asserted is false.

"Through market research, advisory boards, and our field team engagements, we have confirmed that UKONIQ is a

different -- is seen as a differentiated product."

MR. CHRISTIE:  So, your Honor, I don't mean to interrupt you, though you asked me to.  That is one of the parts where we think -- when they say UKONIQ is different, is seen as a differentiated product, we think that's false and misleading, your Honor, and the reason for that is because investors understood that differentiated meant safe.  And Mr. Weiner had spoken a lot about the fact that these were very dangerous drugs.  No other PI3K inhibitors had been successful in being approved and then used on a consistent basis and successfully commercialized because they were dangerous.

And I have just some proof for you in the complaint from that, your Honor.  That's paragraph 115, and that's from an Evercore analyst from August 2, 2021, and he says: "UKONIQ's safety is a key differentiator.  UKONIQ has a cleaner safety profile versus approved PI3K inhibitors," and then he mentions two competitors.  "So far PI3Ks have had minor impact on treatment landscape due to worrying toxicities and high discontinuation rates that increase over time, but newer products, such as UKONIQ, seem to have addressed that."

So when they say "differentiated," your Honor, they're saying, looky here, we're the first ones to be able to do this because we're safe, because we don't have toxicity levels, because we don't have discontinuation.  When they make a statement to the market, your Honor, that we're differentiated,

MCKHShaO

we're different, UKONIQ is different, your Honor, that's false and misleading because it's not safe, and they know it's not safe.  Sorry.

THE COURT:  In the next sentence they modify what you say they're saying through the use of the term "differentiated."  They say, among other things, that it has a "tolerable safety profile."  Now, you're asserting that's false?

MR. CHRISTIE:  Yes, your Honor.

THE COURT:  Because?

MR. CHRISTIE:  Well, because the occurrence of the SAEs that they knew about demonstrated that it did not have a tolerable safety profile because people were getting hospitalized, dying, and were resulting in disabilities.

THE COURT:  You're saying that the word "tolerable" is really an assertion of what the person consuming the drugs --

MR. CHRISTIE:  Correct, your Honor.

THE COURT:  -- that they can tolerate them.  They may have side effects, but they're not ones that are intolerable.  And you're saying that that's really a statement of fact when you consider what the data showed?

MR. CHRISTIE:  Correct, your Honor.  I mean, I think if someone dies or is hospitalized, most likely they wouldn't be taking the drug anymore.  I think they would be discontinued.  It wouldn't be deemed tolerable, so yes.  Again,

your Honor, those terms, "tolerable safety profile," together I think really explain what we're talking about.  It's not just the tolerable part, it's also the safety profile part, and it has to be read together, I think, to fully understand what -- the point defendants are trying to tout, the safety profile, when behind the scenes they're failing to mention that they're aware that people are dying and what we allege is at an alarming rate.

THE COURT:  OK.  Go ahead.

MR. CHRISTIE:  OK.  Thank you.

One other point I would just like to make, Mr. Weiner tried to make it sound like the class period ends at November 30, which is when the first disclosure, corrective disclosure, we allege, comes out, your Honor.  And I appreciate his point that the language there does say that it came crashing down.  We allege that was a partial disclosure, your Honor, and in fact, the fraud did continue significantly after that.  On that very day the defendants continued to say things like "We believe UKONIQ is a unique PI3K inhibitor with a differentiated toxicity and tolerability profile and believe the data submitted thus far are supportive of approval of U2 in CLL."  That may be so, your Honor, but they're omitting the fact that by this point in time in November, they've got way more deaths occurring, and now the FDA is under the hood and asking them to perform a safety analysis, and they're still not

MCKHShaO

disclosing the continuing SAEs that were happening up until that time.  And your Honor, I'll --

THE COURT:  Remind me, although I know it's somewhere in your complaint, so when there was the disclosure of, I think it was, November 30 --

MR. CHRISTIE:  Correct.

THE COURT:  -- the price of the stock declined by about a third.  I think it was 34.93 percent.  You're saying that thereafter it further declined as a result of further disclosures?

MR. CHRISTIE:  Yes, your Honor.  There's three other corrective disclosures that happen after that.  The first one is when the company -- on April 15, 2022, where the company pulls the drug from being used, and then they wind up their entire oncology program as a result of these issues, these safety issues with the drug.  Thereafter, the FDA becomes concerned with the other half of the U2 combination, your Honor, and that's the ublituximab portion of it.  That's not UKONIQ.  It's the other one.  And they say, hey, we need to check this, and they push out the approval date for that.  And, again, investors get concerned about that as well because of the safety concerns that are surrounding it.

And then lastly, your Honor, the FDA withdraws -- and that's on June 1 -- the FDA withdraws approval of UKONIQ, which is a very rare occurrence in the pharmaceutical industry that

MCKHShaO

the FDA would approve something.  So, again, I want to --

THE COURT:  And my point is, is there a drop in the price on each of those occasions?

MR. CHRISTIE:  Yes, your Honor, and a significant one.

THE COURT:  OK.

MR. CHRISTIE:  I would also just like to mention that the defendants have not contested loss causation in this case or in their briefs.

THE COURT:  By the way, all that's reserved, of course, everything that they --

MR. CHRISTIE:  Of course.  We're not done with that, I'm sure.

THE COURT:  I mention that only because defense counsel said they were conceding for today, for this motion's purpose, the knowledge of the individual defendants, but that's not a binding admission as to what discovery may or may not show.

MR. CHRISTIE:  Understood, your Honor.  We won't hold them to that.

THE COURT:  OK.  Go ahead.

MR. CHRISTIE:  Yes, sir.

So just one other thing I'd like to mention, and even if the Court were to consider some of these statements opinion statements -- and, again, we posit that many of them aren't -- there are some we think could arguably be considered opinion

statements.  But under relevant Second Circuit authority -- and I'm talking about the *Abramson* case here, and that's *Abramson v. NewLink Genetics*, 965 F.3d 165.  That's a Second Circuit opinion from 2022 that sets forth that the test both parties essentially have adopted for whether or not these are opinion statements.  We think under any of the three tests you'd still have actionable opinion statements here, your Honor.

THE COURT:  I thought *Abramson* was 2020.

MR. CHRISTIE:  It's 2020, your Honor.  Did I said 2021?

THE COURT:  No, you said 2022.

MR. CHRISTIE:  Oh, my apologies.

THE COURT:  2022, I might not have read it.  I, of course, avoid reading Second Circuit opinions whenever possible.

MR. CHRISTIE:  That was my fault, your Honor.  I got the date wrong.

THE COURT:  Anyway, go ahead.

MR. CHRISTIE:  Yeah.  So the point here is even if you consider some of these opinion statements, we believe they're actionable opinion statements.  And, your Honor, under any of the three tests, we feel that's the case.

I'd like to focus on the third test, which is that the statement failed to provide critical context; meaning that the

MCKHShaO

speaker implied he or she had a reasonable basis for the opinion but in fact did not. And the *Abramson* case has some excellent language here which I think is highly applicable to the case here, and that's "when omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable."

So even the statements that defendants say "we believe our safety profile is more tolerable" or "we have a differentiated safety profile," there's omitted facts that are contrary to that fact that the defendants -- not only do they know about, and that goes to a different part of the opinion test, your Honor, but we think that that is -- those facts would substantially undermine the conclusion a reasonable investor would take away from that. Either they went and looked at the SAE data and then misrepresented it or they didn't, in which case that's recklessness, your Honor.

So under that test and, as we mentioned in our brief, as well under the other two tests that *Abramson* sets forth, we think that even if they are opinion statements, we believe they're actionable.

THE COURT: All right. Thank you very much. Let me hear from defense counsel in rebuttal.

MR. WEINER: Thank you, your Honor. So I'll try and respond to some of those points.

MCKHShaO

First of all, your reference to the fact that the data was available in the database, was reported to the FDA, it was publicly available. And I point your Honor to Judge Liman's decision in the *Rice* case which we point to which reaches that very same conclusion. So we think that --

THE COURT: But they say it's not really easily publicly available, and they suggest that's inferentially shown by the analyst later on saying we're learning for the very first time X or Y. And for purposes of a motion to dismiss, why shouldn't I draw that combination of inferences in their favor?

MR. WEINER: Well, again, I think that Judge Liman --

THE COURT: It would not be the -- if I disclosed some bad news in a database that anyone could access if they did 27 steps, that's not really perhaps a public disclosure.

MR. WEINER: But this is not nearly that complicated. This is an FDA database. It's not some obscure, you know, database that no one knows exists or anything like that. After all, it's a pharmaceutical company. So, of course, investors should be conscious of, if they're interested in that, what's going on with the FDA and be able to search it. So I think it's a perfectly reasonable inference to draw against the plaintiff that this data is available and investors are on notice of it. They may choose not to look at it.

And as to the analysts, I think it's completely false

MCKHShaO

to say the analysts were surprised by the SAEs because there's nothing to that effect here.  The analysts understood, as everyone did, that these were dangerous drugs and that there would be SAEs.  I think it's important that the fundamental flaw here with this complaint is we heard that when the company said "differentiated safety profile," Mr. Christie says that means the drugs were safe.  No, no one said they were safe, and no one would think they were safe.  These are dangerous drugs for terminally ill people suffering from leukemia who have failed other drug trials or other drugs have not been successful in helping them.  So that's a huge --

THE COURT:  Well, you do say or Mr. Waldman said there's a tolerable safety profile.

MR. WEINER:  Right.  And I want to come to that in a second, your Honor.

THE COURT:  Yes.

MR. WEINER:  But just to say -- paragraph 74 of their complaint, this is what they say:  "While promising, the pharmaceutical technology behind UKONIQ known as a PI3K inhibitor was understood to be a dangerous treatment option because inhibiting the PI3K receptor leads to significantly increased risk of serious infection and associated toxicity which can elicit dangerous side effects."

So given that, there's nothing about the fact that there are SAEs occurring in this population after the drug's

MCKHShaO

been approved by the FDA and is being taken by patients that would set off alarm bells or be shocking. And they don't have any allegation, there's no allegation, that anyone inside the company was worried about this; that the FDA made any -- you know, raised any concerns. There is an FDA statement or request for information about deaths. That's not SAEs. That's a specific thing. And it's deaths compared to the control arm for U2. And, again, that was made in September. The company investigated, provided the data, and soon thereafter disclosed it in this November 30 disclosure, which is the key disclosure because at that point the FDA had taken a serious step. It had indicated it was convening a meeting of the ODAC. And the disclosure laid out what that meant and all the risks that that conveyed.

Now, tolerable safety profile, again, there has to be a -- there have to be allegations about what is -- about how SAEs mean it's not a tolerable safety profile compared to what would be expected for this population taking this kind of a drug compared to the competitor drugs, and they don't have any allegation in that regard. Literally zero. They just plead the raw thing, the raw data. You know, there's SAEs. And that is not sufficient.

I think to the question about, well, what's behind the tolerable safety profile statements, this is also crucial. There's no allegation that the company was just making it up

MCKHShaO

and pulling it out of thin air.  In fact, there is a statement. There's one statement in September, and I think September to November is a critical time frame because before then there really aren't any allegations about a serious SAE uptick or anything like that.  The FDA inquiry comes in September, and then in November we've got the disclosures and the stock drops significantly.

So what's the one statement that's made in this window, September to November?  It's a statement by Mr. Weiss, and it starts with we believe that certain UKONIQ patient data published in a journal, *Blood Advances*, "further support the differentiated safety profile of UKONIQ, the first and only PI3K-delta inhibitor," etc.

So that's a clear statement of opinion, but it's referencing a study that was done, and it references -- there's 371 patients in the study.  There's no allegation that Mr. Weiss's statements are false, that the study didn't exist, that the study didn't reach those conclusions.  So everything about tolerable safety profile is substantiated.  And the only thing they have to counter that is, again, that there are SAEs in a drug that everyone knows is dangerous and is expected to have SAEs.

THE COURT:  What's your view, given the last part of what you just said, as to why the stock declined so dramatically on November 30?

MCKHShaO

MR. WEINER:  Oh, I think it's quite clear that on November 30 there's multiple statements and disclosures by the company.  First and foremost, there is now the -- the FDA has indicated some concern around overall survival in the U2 trial, and so that's one.  There's concern about that.  Two, as a result, they've indicated they're going to be having an ODAC meeting.  Number three, the ODAC meeting, as disclosed by the company, could also relate to or raise issues around UKONIQ.

So all of that is disclosed then based on the communication from the FDA, and there's no allegation that there was -- that there was not a timely report of that communication from the FDA or any statements in the interim that were somehow contrary to that.

THE COURT:  All right.

MR. WEINER:  The last point, your Honor, is just I think it's also important to undermine this notion that there was this terrible data out there and the company was ignoring it and falsely repeating statements about tolerable safety profile and differentiated profile.  But the FDA was fully aware of all of these SAEs and the overall survival data in the U2 trial, and yet the FDA is not -- did not take any action immediately when these statements were made, when they had this data.  There was only -- it was only in November that they called for this ODAC, and even then they didn't shut down the clinical trial.  They didn't shut down UKONIQ or withdraw its

MCKHShaO

approval.  They didn't even schedule the ODAC meeting then, and it wasn't even scheduled to take place until April, some five, six months later.

All of that tells you that there was not some enormous worry at the FDA that there are these terrible incidents happening, and they're contrary to the notion that this is a differentiated and safe drug or that the U2 drug is -- has no prospect with the FDA.

THE COURT:  All right.

MR. WEINER:  I think that's an important thing to consider.  So thank you very much.

THE COURT:  Thank you very much.

Let me hear, finally, from plaintiff's counsel in surrebuttal.

MR. CHRISTIE:  So, your Honor, I'll keep this brief.

The last point that Mr. Weiner makes was about the fact that the FDA didn't take any action.  I don't know if that's exactly on point.  The FDA did submit an OS request asking for the company to provide them with an in-depth assessment of the safety information as of the end of September and then asked for updated information about it as well.

So the fact that the FDA -- you know, at the rate at which it moves and the rate at which it performed this inquiry about the safety, we think may be very well in line with what was going on.

MCKHShaO

And just to put a finer point on that, we included many allegations in the complaint, your Honor, that they were working hand in hand with the FDA at the time, right?  We talk about them having breakthrough therapy, and they have all these other FDA -- all these other things where they're working with the FDA in order to work with them on these clinical trials. So they were working with them.

And then the other thing I would just mention, your Honor, is that in January there's an allegation that the company actually does -- they do stop enrolling people in the trial.  The defendant Weiss has a fireside chat, and during that that he states that individually they're going to stop enrolling people in the clinical trial.  So the fact that they do that kind of suggests that the FDA didn't need to get involved in that time because they knew that.

So with that, your Honor, that's all I have.

THE COURT:  All right.  Thank you very much.  I want to thank both counsel for an excellent argument.

So my usual practice, which I will adopt here, in PSLRA cases is to get you a bottom-line ruling first so that if there is going to be -- if the case is going to continue, discovery can begin, and if it's not, you know where you stand. And then I always follow it up with a full opinion.  So the question is when to get you that bottom line.

Now, in a moment of weakness, I told my law clerks

MCKHShaO

they could take next week off.  Of course, I was shocked when they didn't refuse that offer.  But I think, realistically, we're talking about the middle of January.  So let me put a specific date on it.

All right.  So I will get you a bottom-line ruling by -- oh, perfect, Friday, the 13th, but with opinion to follow.  If I conclude the case is gone, it's gone, and then you would just wait for the final opinion.  If I conclude the case goes forward in part or in whole, then you'll need to jointly, the following week, call my chambers, and we'll set a schedule for discovery.

So again my many thanks, and that concludes this proceeding.

(Adjourned)